[Civ. No. 1885.  Third Appellate District.—December 13, 1918.]

PAUL D. BUCKINGHAM, Respondent, v. COMMARY-PETERSON COMPANY (a Corporation), et al., Appellants.

NEGLIGENCE—COLLISION OF AUTOMOBILE WITH DIRT-PILE—STATE HIGHWAY—CONTRIBUTORY NEGLIGENCE.—In an action for damages for personal injuries received by the plaintiff while driving an automobile in the night-time over a portion of the state highway in process of construction and which injuries were caused by a collision with an embankment of dirt and gravel, the plaintiff is precluded from recovery on the ground of contributory negligence, notwithstanding the absence of barriers and lights where it is shown that plaintiff had for many years resided in the community through which the road passed, had knowledge of its reconstruction, and also knew of the existence of a cross-road leading to the place of his destination which could be safely traveled.

ID.—USE OF DEFECTIVE HIGHWAY.—Any person who uses and is injured on a defective highway, knowing, or having reason to know, that it is then in process of construction, and for that reason is not open to general use by the public, is himself guilty of negligence, unless he used such highway because it was *necessary* to do so, and even in such case he must exercise great care.

ID.—CONSTRUCTION OF STATE HIGHWAY—NEGLIGENCE OF CONTRACTOR—STATE OFFICERS NOT LIABLE.—The state engineer and the members of the highway commission, in whom is vested by law the authority

to inaugurate and supervise the construction of state highways, cannot be held liable for any damage to third persons which may follow from acts of negligence by the contractor committed in the performance of his contract.

APPEAL from a judgment of the Superior Court of Solano County.   William T. O'Donnell, Judge.   Reversed.

The facts are stated in the opinion of the court.

Samuel Knight, F. E. Boland and C. C. Carleton for Appellants.

Brantley W. Dobbins and H. M. Anthony for Respondent.

HART, J.—This is an action to recover damages for personal injuries.

The complaint alleges that, on or about the eighth day of June, 1914, the defendant, Commary-Peterson Company, to which we shall hereinafter refer as "the corporation," entered into a written agreement with the state of California for the construction of a portion of the state highway in the county of Solano, between the town of Fairfield and the town of Vacaville, known as "Highway Division 3, Route 7, Sec. C"; that thereafter the corporation "and said defendant, Austin B. Fletcher, the highway engineer named in said contract, and defendants, Darlington, Stern and Blaney, the highway commission named in said contract, commenced each and all to construct the said portion . . . of said highway and entered into complete control and supervision of the said highway; that said portion of said highway was at all times herein mentioned and particularly on the date next hereinafter mentioned an open public road and highway and the public was permitted to and did travel over and along said highway by means of vehicles and otherwise." Then follow allegations that the defendants. while engaged in constructing said highway, opened and left open a certain culvert crossing under the traveled portion of said highway and placed and left on the same near said culvert a quantity of dirt and gravel in such manner as that it formed across the surface of said highway "a small and abrupt embankment about one foot in height above the surface of the traveled portion of the highway"; that the defendants negligently and carelessly failed and

omitted to place at or upon the highway any sign, warning, light or signal of any kind to warn or give notice to persons traveling on and along said highway ''and approaching the said pit, of the danger of running upon and into the same, or of the condition thereof as herein above alleged''; that, on the night of November 3, 1914, the plaintiff was carefully proceeding upon and along said highway in an automobile, traveling from the town of Vacaville southerly toward the town of Fairfield, and that by reason of the negligence of the defendants and each of them, as above indicated, he was unable to see the said pit and to know the danger thereof to persons traveling on said highway, and ran the automobile into said pit and said embankment of dirt and gravel, causing the machine ''to vault and jump in such manner as to violently throw plaintiff out of the same on to the ground, causing a compound fracture of the left leg.'' The effect of plaintiff's injury upon his capacity to perform his usual or accustomed duties is then alleged, and the prayer is for judgment in the aggregate sum of $7,284.

The several defendants interposed answers, in which they specifically deny each and all of the material averments of the complaint.

A trial by jury resulted in a verdict for the plaintiff and against all the defendants for damages in the sum of $5,284. Judgment was entered upon the verdict in the sum so awarded.

The appeal is by all the defendants from said judgment.

Two points principally relied upon by the appellants are: 1. That the plaintiff himself was guilty of negligence which contributed to the accident and the injuries which he sustained as a consequence thereof; 2. That the corporation was an independent contractor and consequently the state engineer and the members of the highway commission, named and joined as defendants with the corporation, are not chargeable with any negligence on the part of the corporation which might have been the direct cause of the injuries received by the plaintiff.

1. The facts disclosed by the evidence are as follows: Pursuant to the contract referred to in the complaint and to which we have alluded above, the contractor commenced work on the highway in question, beginning at the town of Fairfield and working northerly toward Vacaville. At the time of the accident complained of the concrete base of the highway had been laid for a distance of five miles north of Fairfield to

a point variously called "Titel's," "White Caps" and "Half Way House." For a distance of two miles farther, to what is called in the record "Nelson's Ranch," the roadbed had been graded, cement had been poured, and "checks" formed by throwing up dirt to a height of a few inches, had been placed on the concrete to hold the water used to set the concrete. Beyond the Nelson ranch, toward Vacaville, was a ranch owned by T. H. Buckingham, father of the plaintiff. For some time previous to the time of the accident the plaintiff had been operating a pumping plant, located at the side of the road in front of his father's property, supplying water to the mixer used in making the concrete which was poured on to the roadbed.

About one-half mile south of Titel's, and at Nelson's ranch, about two and one-half miles farther north, are roads running at right angles to the highway and connecting, at a point several miles to the east, with a road paralleling the highway under construction. The accident occurred at a point near Titel's, about two hundred and twenty-five yards south of the road first above mentioned, which is known as the "Cement Road," the other being spoken of as the "Nelson Road." At this point there was a break in the highway about five feet wide and an excavation five feet deep, it being the intention later to place therein a concrete culvert. Dirt had been thrown up to a height of about three feet, lying across the highway from side to side on both sides of the excavation.

A general election was held in the state of California on the third day of November, 1914, and plaintiff, at that time twenty-three years of age, was engaged during the day in conveying voters to the polls at Vacaville. At about 2 o'clock on the morning of the 4th of November, plaintiff entered the election booth at Vacaville "to see how the count was," and there met S. P. Dobbins, Jr., a young man twenty-one years of age. Plaintiff remarked that he would like to know "how it is coming out in Suisun," to which Dobbins replied that he would like to go himself and that he had a machine in the garage. He got the automobile, and, at some time between 2:30 and 3 o'clock in the morning the two started for Suisun. It was a bright moonlight night. Plaintiff testified: "We left right straight out the highway, as I always do when I go home, and then it was pretty rough in spots, and in order to cut out some of the rough spots I went through

the ranch, and I also wanted to get a robe, so I stopped in at the ranch and by going through the ranch I cut off about half a mile or so of this bad road, or three-quarters. . . . From Vacaville to my father's place we could go right on top. . . . We proceeded on down the road; there is where the rough road commenced; we had to go on the low gear and intermediate gears; it was so rough you could not do anything else. We proceeded along the highway until we got to the concrete. As I remember it, the concrete had a small break in it there about the Swanson place, the other side of White Caps; . . . we went over a little knoll and slowed up at this road that turns off for Cement. This was a road after I got on this concrete. I knew that I did not know the road; and we slowed up at this point to see if there was anything to tell us, any barriers to stop. There did not seem to be anything noticeable there that we could see. I had raised up in my seat; I could not see any lantern, I could not see any sign. There had been one there once, that I knew. . . . I just told Mr. Dobbins, 'I guess she is open, I don't see anything.' . . . Driving along, the next thing I know I think we saw a pile of dirt there, and the accident occurred and I was knocked unconscious, and I don't remember anything much about it. . . . All I can remember is seeing this little pile of dirt, I should judge a foot and a half or twenty inches high.'' The witness stated that he did not remember seeing any boards on top of the concrete next to the opening or any lights, and said: ''We came over some pretty horrible roads before we got there and seemed to see all turns and so forth.'' He testified that he was familiar with the road as far down as the Half Way House; that while he was pumping water he would jump on auto trucks loaded with rock and ride up to the mixer where they were laying the concrete, ''so that I was familiar with all the turns of the road.'' At that time the mixer was in front of the Nelson ranch. Asked if he knew whether the road was completed from the point where the mixer was to Fairfield, he replied: ''That seemed to be the general public report, that was the news that was buzzing around, that they had scraped the dirt off the road from the Half Way House to Fairfield, and that you could use it. The general information was, you could hear people say, 'You can travel the road now from the Half Way House to Suisun.' ''

On cross-examination, plaintiff testified that after the polls closed he went to his home and returned to Vacaville at about 8 o'clock. At 8:15, a party of three or four, including plaintiff, drove to a roadhouse about six miles above Vacaville (which town was "dry") "and had a glass of beer and left." They returned to Vacaville at about 10 o'clock; plaintiff went to a hall where a dance was in progress, stayed there a few minutes and then went to the polling place. The same parties again drove to the roadhouse at about 11 o'clock, stayed there a few minutes, "had a glass of beer" and returned to Vacaville. He said that when he and Dobbins went to the Buckingham ranch they each "had a very small drink of whisky." The witness testified that he "recalled" that they passed three barriers between Vacaville and the place where the accident occurred and that at the first road they passed there was a sign reading, "Turn here"; that he saw such signs "lots of times, but not on that particular night; I had seen them there before as I had driven down that road weeks before. Q. At the corner of that road (Nelson's) was there not a sign saying 'Road closed, turn here?' A. Yes, sir. Q. On this particular night? A. Yes, sir. Q. You saw that, did you not? A. I took no particular notice of it. Q. You knew it was there from being there formerly? A. Yes. sir." He said that he knew of the cross-road between Titel's place and the point where the accident occurred and which turned off about two hundred and twenty-five yards from where the automobile struck the dirt-pile. As to the speed at which they were traveling, plaintiff said that they traveled in first and second gears up to the concrete and then went into third and "were going somewhere between twenty and thirty miles an hour." When he stood up to look ahead they had slowed down to ten or fifteen miles and then started ahead at twenty-five or thirty miles an hour—he thought probably twenty-five or twenty-six miles.

S. P. Dobbins, Jr., testified that he was playing pool all the evening of election day until about 2:30 in the morning, when he went to the polls and there met plaintiff. He drove the machine in which they left Vacaville and he said that after leaving the Nelson ranch he saw no barriers or lights on the highway; at the Nelson road "there was a barrier there that had been a barrier, the sides of the road were fenced up, but the middle of the highway was open. From there to White

Caps the road had been graded and before we got there, and was all cut up in big clods; it was high in the middle and the sides were in ditches. Had to run in the ditches, sometimes on the top and sometimes clear across to the other ditch. In fact we were all over the road." The witness described the accident as happening in about the same manner as testified to by plaintiff. On cross-examination he stated that he did not take a drink at Buckingham's; that he did not get out of the machine and that plaintiff did not bring him one, but that at 11:30 of the night before he had gone to the same road-house mentioned by plaintiff and had one glass of beer.

The testimony shows that the barriers maintained consisted of posts, two by four, with two by four rails placed on them and wired. The barriers extended clear across the right of way, from one fence to the other. There was a traveled way along the side of the material and the barriers were left in such manner that persons passing might take them down; people traveling to the ranches along the highway would have to use the highway to get to their places of abode; the concrete having checks of dirt upon it, people would have to use the side of the road.

There was testimony given by other witnesses, introduced by the plaintiff, that there were neither lights nor barriers where and at the time the accident occurred. On the other hand, the defense presented witnesses who testified that there were barriers at certain points on the highway and a light placed at the point where the automobile struck the dirt-pile. It is not necessary, however, to reproduce herein any of said testimony; nor do we consider it important, in the decision of this case, definitely to know whether there were barriers at any points on the highway or a light at the obstruction with which the automobile collided. It may, indeed, be conceded that, at the time of the accident, there were no barries extending completely across the road anywhere, and that there was no light at the point where the accident occurred, and still we are constrained to the conclusion, from the plaintiff's own testimony as well as from that of his companion, Dobbins, that he, by his own inexcusable and culpable negligence, contributed to the damage sustained by him as a consequence of the collision of the automobile in which he was riding with the dirt-pile. In other words, we think it is plainly manifest from his own admissions that but for his own negli-

gence the accident would never have occurred. He had for many years resided in the community through which the road passes, and had for some time been employed at a place situated in near proximity to the road. He knew that the road was being reconstructed under the authority of the state, and that the character of highway construction being prosecuted by the state was such as to require the old roadbed and culverts crossing it to be torn up and removed so that the highway was wholly unfit for use by the traveling public. He knew that barriers had all along been maintained on the highway to prevent its use while under reconstruction, and knew that at a certain point between Vacaville and the place where the accident happened, a cross-road leading to Suisun, the place of destination of himself and companion on the night of the mishap, turned away from the road under construction and over which he was traveling, and he further knew that there was maintained at the point where said cross-road so turned off a sign, warning people traveling over the road under construction to take the cross-road. He, in brief, at all times knew the general conditions existing in and upon the road under construction. Neither the plaintiff nor his companion, Dobbins, testified that he had any positive or definite information that the highway, on the night of the accident, was in a condition to be used by the traveling public. In fact, the plaintiff himself testified that all the information he had on the subject was that whose source was a vague, indefinite rumor in the neighborhood that the highway was completed and available for use, or, as he himself expressed it, "that the news was buzzing around that they had scraped the dirt off the road from the Half Way House to Fairfield, and that you could use it." It is very clear, therefore, that, while he was familiar with the fact that the highway was under process of reconstruction and had, down to the time of the accident, knowledge of the conditions which had existed with respect to the highway, and knew that, unless the dirt had been scraped from the road and other obstructions necessitated by reason of the work of construction had been removed, it was not safe to attempt to pass over the road with an automobile in the night-time, he never had taken the pains to ascertain definitely or with certainty for himself whether the report of its completion which was "buzzing around" was correct or not. That both he and Dobbins were in grave doubt as to

the safety of the road is plainly shown by the fact that, just prior to reaching the point at which the accident occurred, the plaintiff arose from his seat in the automobile and, standing erect for a moment, thus took a survey of the situation before him to determine whether the road was or was not perfectly safe to proceed on at the rate of speed—twenty-five or thirty miles an hour—at which they had previously been traveling. Furthermore, according to the testimony of Dobbins, he was required to drive the machine, before reaching the dirt-pile, "in the ditches, sometimes on the top and sometimes clear across to the other ditch—in fact all over the road." This itself ought to have been sufficient warning that the greatest care was required of them to get the machine over the highway with safety to themselves. Both the plaintiff and his companion knew of the cross-road above referred to, knew that it would take them, if used by them, to the place where they proposed going, and knew that, although not a modern highway, it was in a good and safe condition for use by the traveling public.

With the knowledge which the plaintiff had of the condition of the highway over which he attempted to make his way to Suisun, it is, as above stated, a matter of no material importance whether the barriers were maintained across the road or lights kept at points where there were obstructions caused by the tearing up of the road or the piling thereon of materials to be used in the work of construction. Barriers and lights and other such warnings placed on streets or highways which are undergoing construction or improvement are for those of the traveling public who have no knowledge or previous notice of the conditions which render the thoroughfare unsafe for use. Therefore, those having actual knowledge of the existence of such unsafe conditions, or who, having had such knowledge, attempt to use the street or highway without first informing themselves as to whether such conditions have been removed and the highway thus made suitable and safe for general use, do so at their own peril.

There are innumerable cases the facts of which are strikingly similar to those disclosed by this record, and in which the courts have with unbroken uniformity held that the injuries complained of were entirely and directly imputable to those complaining. To some of those cases we will now refer.

In *Compton* v. *Revere,* 179 Mass. 413, [60 N. E. 931], a Massachusetts case, the plaintiff complained of injuries sustained in slipping and falling on a highway. It appears that the grade of the highway was being changed, but, the winter season coming on before the work was completed, further work thereon was abandoned and postponed until better weather returned, the defendants leaving the road in a rough and unsafe condition for use. The plaintiff testified that he was and had been familiar with the fact that the same condition of the highway had existed for a month, and that there was another way of reaching the place where he was going when hurt, but that it was not so convenient a way of getting there. The defendants requested an instructed verdict, which was refused. The court, holding that the request of the defendants should have been granted, said:

"It is obvious that the plaintiff knew all that there was to know about the condition of things, and, in attempting to use the street, did it at his peril. The case cannot be distinguished from *Jones* v. *Collins,* 177 Mass. 444, [59 N. E. 64], unless the question of a want of barriers makes a difference. There was a conflict of evidence on the point whether barriers had ever been placed on Beach Street. But we do not regard the question as material in this case. The object of a barrier is to notify the public that it is unsafe to proceed, but, where the condition of the street is such as is shown by the evidence in this case, the condition itself is as strong a notice as any that could be given. Nor do we regard it as material that prior to the accident some wagons were driven over the street. There are always persons who take risks, if a short cut can be made, and who will go over a street even if it is obviously not open to public travel."

In *Jones* v. *Collins,* 177 Mass. 444, [59 N. E. 64], referred to in the above-cited case of *Compton* v. *Revere,* the action was for injuries sustained by the plaintiff while in the act of passing along a new street, which was then undergoing construction under proceedings duly inaugurated by the public authorities. There was evidence to the effect that, although barriers with proper signs had been placed and were maintained across each end of the new street and across the ends of the streets leading into it, the plaintiff was not aware of the fact that the street was in process of construction. It seems, though, that the barriers did not extend across the entire space

at the end of the street, a sufficient space being left open at each side to enable pedestrians to pass by. The plaintiff secured a verdict, and, in granting a new trial on appeal, the Massachusetts supreme court, among other things, said:

"It is not essential that such notice shall be brought to the actual knowledge of all persons, and it is immaterial to the duty of the defendants to the plaintiff in the present case whether she had actual knowledge that the street had been closed for travel. The barriers and signs which were in fact up and had been for many days, were enough to fix the right of the defendants to control the place, without being under obligations to keep it in any condition other than that resulting from the legitimate prosecution of the work of construction in accordance with the order under which they worked. In the opinion of a majority of the court, the verdict should be set aside and a new trial granted."

In the instant case, as has been shown, the plaintiff knew of another road which he could have taken to Suisun—a road which had been generally used and which was perfectly safe for use. In *Hill* v. *Tionesta*, 146 Pa. St. 11, [23 Atl. 204, 205], decided by the supreme court of Pennsylvania, the court said: "It was proved by undisputed testimony on both sides that there was another road, somewhat longer, over which the hauling could be done, and as to a few of the earlier loads was done, without incurring the risks which were so very manifest on this road. The case is plainly brought within a long line of decisions which established as an inference of law the contributory negligence of the plaintiff."

In the West Virginia case of *Shriver* v. *Marion County Court*, 66 W. Va. 685, [26 L. R. A. (N. S.) 377, 66 S. E. 1062, 1064], the plaintiff was driving a team hitched to a wagon loaded with merchandise over a street which was plainly and conspicuously defective. The wheels of the wagon went into a deep mud hole in the street, with the result that the vehicle was tipped over and the plaintiff thrown with violence to the ground, whereby he sustained a fractured leg. The serious question in the case was whether there was another way which the plaintiff could have taken, and as to that the evidence was not certain or clear. The court said:

"The liberty, right and power of the citizen in respect to the use of highways being very broad, it is neither unreasonable nor unjust to require him to avail himself of his wide latitude

of choice, impose upon him the duty to exercise reasonable care and prudence, and hold him guilty of contributory negligence when, by reason of his omission thereof, injury results to him or his property. As in all other cases arising under the law of negligence, his voluntary and unnecessary encountering of danger amounts to an assumption of risk and bars recovery, if he had knowledge of the danger, or, *by reason of its obviousness, he was bound to know it.* [Italics ours.] This principle has been uniformly adhered to in the decisions of this court. We do not recall an instance in which a recovery for injury occasioned by a known or obvious defect has ever been allowed, and some of our decisions go so far as to intimate that under no circumstances can there be a recovery for such an injury, if the defect by which it is occasioned was so open and apparent that the traveler, exercising reasonable care and prudence for his safety, ought to have detected and avoided it.''

Again, the court in that case further said: ''Another principle, asserted by the courts generally, though correct, has a tendency to mislead. It is that the use of a road by a traveler with knowledge of its bad condition is not *per se* negligence. On its face this principle seems to be inconsistent with preclusion from recovery by assumption of risk. It seems necessarily to imply a right to use in a careful manner a bad road and recover in case of injury, but this is not necessarily true. Rightly interpreted, the expression means no more than that the citizen may use such a road with knowledge of its condition and still recover for injury, if the circumstances were such as to justify the assumption of risk, on the ground of necessity, and he exercised care, and also when the injury was caused, not by the open and apparent defects of which the plaintiff had knowledge, but by another latent, hidden defect in the same street or walk of which he had no knowledge, as in the case of *Moore* v. *Huntington,* 31 W. Va. 842, [8 S. E. 512]''; *Chapman* v. *Milton,* 31 W. Va. 384, [7 S. E. 22]. (See, also, *Klatt* v. *City of Milwaukee,* 53 Wis. 196, [40 Am. Rep. 759, 10 N. W. 162]; *Hunter* v. *City of Montesano,* 60 Wash. 489, [Ann. Cas. 1912B, 955, 111 Pac. 571, 572]; *McGraw* v. *Friend etc. Lumber Co.,* 120 Cal. 574, 578, [52 Pac. 1004]; *Slaughter* v. *City of Huntington,* 64 W. Va. 237, [16 L. R. A. (N. S.) 459, 61 S. E. 154, 156].)

By the foregoing authorities it is clearly and unquestionably established that any person who uses and is injured on a defective highway, knowing, or having reason to know, that it is then in process of construction, and for that reason is not open to general use by the public, is himself guilty of negligence, unless he has used such highway because it was *necessary* to do so, and that even in such case he must exercise great care. There seems to be no reason for doubting that the facts of the present case bring it clearly within the principles enunciated and applied in the cases above considered. Indeed, in our opinion, there is such a marked similarity between the facts of this case and those of the cited cases, that nothing more need be said of the case before us upon the question of contributory negligence, than what has been reproduced above from the cases referred to.

While the conclusion thus arrived at is, of course, decisive of the case, yet, in view of the fact that the state is a party to the contract in question here, and of the further fact that it is probable, if, indeed, not certain, that similar contracts will, in the future, be made by the state, we feel that it is no more than right and proper that the public officers, upon whom the law imposes the duty of inaugurating and prosecuting state highway construction should know what their legal status is with respect to such contracts. Therefore, we deem it only just to them, since the question is here put squarely before us, to consider and decide whether, under such circumstances as are present in this case, the state engineer and the members of the highway commission, in whom is vested by law the authority to inaugurate and supervise the construction of state highways, can be held liable for any damage to third persons which may follow from acts of negligence by the contractor, committed in the performance of his contract. This question, in the form in which it arises and is presented here, is whether the corporation defendant was an independent contractor, and is alone responsible and liable for the damage of which complaint is herein made.

In the year 1902, the people adopted section 36 of article IV of the constitution, which reads as follows: "The legislature shall have power to establish a system of state highways or to declare any road a state highway, and to pass all laws necessary or proper to construct and maintain the same, and

to extend aid for the construction and maintenance in whole or in part of any county highway.''

Whether, in view of the fact that, prior to the adoption of that section into the constitution, the counties, which are mere governmental agencies of the state, vested with a variety of powers which the state itself may assume or resume and directly exercise, were given, by the legislature, full and plenary power over the matter of constructing and maintaining highways within their respective limits, the legislature has, by said section, been given power which it had not theretofore possessed, is a question wholly foreign to the present discussion. It is enough, for present purposes, to know that thus the state has expressly taken to itself the right to establish and maintain a system of state highways, and to give aid in the construction of county highways, and that, in pursuance of said section, the legislature of 1907, and by a subsequent amendatory act (Stats. 1911, p. 823 et seq.), has established the machinery whereby the terms of the constitutional provision referred to should be, and is being, carried out. By section 9 of said act it is provided:

''The department of engineering shall take full possession and control of all roads which have been declared state highways, . . . and all other state highways which may hereafter be constructed and all public work being done or now completed by the department of highways. All expenditures by the state for highway purposes except as otherwise hereafter provided by law shall be under the full charge of the department of engineering, . . .

''It shall have power to alter or change the route of a road and shall do all things necessary, and obtain all tools and implements required to properly care for and manage the roads under the charge of the department. . . .

''Whenever under any statutes of this state the performance of any duty or obligation is imposed upon the department of highways, the same shall be assumed by and the performance of the same shall devolve upon the department of engineering.''

Counsel for the respondent argue that, under the foregoing provisions of the act creating the department of engineering, the officers appointed to execute the duties thereof, being responsible and legally liable for the negligent performance of their duties as such officers, are also likewise liable for any

damage resulting from any negligence characterizing the performance by the contractors of contracts for highway construction inaugurated and prosecuted under said act, where injury or damage to person or property has directly followed from such negligence. In other words, as we understand the contention of the respondent, it is that the provisions of the act in question, *ex proprio vigore,* make the advisory board, consisting of the members of the highway commission, and the state engineer, under whose general direction and superintendence all state highway construction must be carried on, responsible and liable for any damage which directly results from negligence occurring in the actual execution by the contractor of a contract for the construction of a state highway.

There is obviously no merit in the contention, or the argument advanced in its support.

There must always be existent in all public, as well as private, transactions, such as that involved here, the power to compel compliance with the terms of contracts made with reference thereto. If there existed no such power, then obviously, contractors would be at liberty to, and could, change the terms of their contracts according to their own free will and caprices, to the great detriment of the principal or the other contracting party. The man who builds a house upon his land always has the right, whether expressly reserved or not, to see that the contractor performs the contract of construction according to the adopted plans and specifications, and to compel the performance of the contract as the contractor has agreed to do the work. And all that the law establishing the department of engineering, and vesting in it the power to establish a system of state highways, attempts or pretends to do in that regard is to clothe the officers of that department with the power to let contracts for highway construction and to supervise the work of construction of the highways for the purpose only of seeing that the work is done, in all particulars, agreeably to the terms of the contract and the plans and specifications. The act really does no more than directly and expressly authorize the state, through its duly appointed and constituted officers, to exercise the same power with respect to the construction and maintenance of public highways as has always been vested in and exercised by the counties through their duly constituted authorities. The power thus conferred upon the state is, in a general sense,

the same as that vested in municipalities by the general Street Improvement Act. (Stats. 1911, p. 733), under the provisions of which the improvement of streets in cities and towns may be coerced at the expense of property owners according to plans and specifications duly prepared for and adopted by the local legislative body, and the work carried on *under the direction* of the superintendent of streets, who is also empowered by section 18 of said act, *in his official capacity,* to make written contracts for such work and to receive bonds for the faithful performance thereof. The street superintendent, under the law, has a general supervisory control over all such contracts for the purpose only of seeing that the work is performed in conformity with the plans and specifications, in accordance with which the contractor has agreed and bound himself to do the work. Further than that, the superintendent has absolutely nothing to do with the contract. He has no voice or choice as to the particular means which the contractor may adopt for performing the contract, and neither he, nor the municipality, can legally be held, merely by reason of the powers and duties they are authorized to exercise and required to perform under the provisions of the street law, responsible or liable for the consequences of any negligent acts, resulting in damage to others, committed by the contractor in the course of the performance of the contract. So it is true as to the case at bar. The law gives to the members of the highway commission and the state engineer only. such power over, and control of, contracts which the state is authorized to make for state highway construction as is absolutely necessary to enable them to discharge the duty with which they, as such officers, are charged, to wit, to make such contracts on behalf of the state and to compel the contractors for such work of construction to perform their contracts in accordance with their terms and the plans and specifications in conformity to which they have agreed to do the work of construction. This states the limit of their connection and concern with such contracts, and it, therefore, results that the law itself cannot justly be so construed as to justify the confirmation of the contention of the respondent that by the very terms of the law themselves the members of the advisory board and the engineer may be compelled to respond in damages for injuries which may follow from the negligent execution of such contracts by the contractors.

So much for the law prescribing and fixing the duties and responsibilities of the state highway commission and the state engineer with respect to state highway construction.

That the corporation defendant in the case at bar was an independent contractor and, therefore, wholly responsible for the proper execution of the terms of its contract, and likewise liable for any damage directly resulting from any negligence committed by it in the course of the performance of the contract, is clearly shown by the contract. The contract is, as the complaint alleges, between the state of California, acting through the defendants, Blaney, Darlington, and Stern, constituting the advisory board of the department of engineering, and Fletcher, the state engineer, and the corporation named as defendant. It is drawn in accordance with the provisions of the act creating the general scheme for the construction of highways by the state, and provides that the corporation shall construct the highway, furnishing for that purpose the materials and labor, according to certain specifications prepared by the advisory board, under the direction of the state engineer. The specifications, in conformity with which the work was to be done, prescribe with particularity the character of the work to be done, the kind and the character of the materials to be used, the price of each particular piece of work essential to the construction of the highway as outlined by the contract, and the price of the materials to be used. The instrument reserves to the advisory board, and the state engineer, the right to exercise such supervision over the work as may be necessary to enable them to determine whether the contractor was performing the work and using the character of materials specified in the contract, and to require the contractor to perform the contract in all respects according to its terms. They were authorized to make alterations in, deviations or omissions from, or additions to, the contract. But they had no right of control as to the mode of doing the work contracted for—that is, neither the board nor the engineer had any say or discretion, under the contract, as to the particular manner in which, or the means by which, the contractor should carry on and complete the work. Neither had they any control over the employees engaged in assisting the contractor, nor could they authoritatively interfere in the matter of determining who should be employed by the contractor to aid him in consummating the contract. The highway, upon the making of

the contract, was to be and was turned over entirely to the contractor, and it allowed to proceed in its own way to accomplish the desired result. Neither the state nor its agents, charged with the duty of letting the contract, were authorized to interfere in the matter of maintaining warning signs and barriers interdicting or cautioning the public against any attempted use of the highway while it was in the course of construction, or to say or determine at what point on the highway such warning signs should be maintained. They were wholly without authority to interfere with the contractor's determination of where, on the highway, it would be the more convenient for the purposes of the work to place and maintain the materials necessary to be used in the work of construction. They, indeed, had absolutely nothing to do with the contract, or the means employed by the contractor for the accomplishment of the work he had agreed to perform, except, as before stated, to compel the contractor, as the superintendent of streets may do in the case of street improvements, or the owner in the case of the erection of a house on his land by a contractor may do, to do the work in all respects according to the terms of the contract—that is to say, to use the specified materials and to make the road that the contract called for.

If the foregoing considerations do not plainly show that the corporation defendant was an independent contractor, we are at a loss to know what would. "An independent contractor," says the supreme court, in *Green* v. *Soule,* 145 Cal. 96, 99, [78 Pac. 337], "is one who, in rendering services, exercises an independent employment or occupation, and represents his employer only as to the results of his work, and not as to the means whereby it is to be accomplished. . . . The chief consideration which determines one to be an independent contractor is the fact that the employer has no right of control as to the mode of doing the work contracted for. (16 Am. & Eng. Ency. of Law, 2d ed., p. 187.) The fact that the work is to be done under the supervision of an architect, or that the employer has the right to make alterations, deviations, additions and omissions from the contract, does not change the relation from that of an independent contractor to that of a mere servant. (16 Am. & Eng. Ency. of Law, 2d ed., p. 187; *Frassi* v. *McDonald,* 122 Cal. 402, [55 Pac. 139, 772].)" We cite the following cases as in support of the foregoing description of an independent contractor, and as confirming our

conclusion that the facts of the transaction involved herein bring the defendant corporation clearly within the category of independent contractors: *Bennett* v. *Truebody,* 66 Cal. 509, [59 Am. Rep. 117, 6 Pac. 329]; *Callan* v. *Bull,* 113 Cal. 593, [45 Pac. 1017]; *Louthan* v. *Hewes,* 138 Cal. 116, [70 Pac. 1065]; *Johnson* v. *Helbing,* 6 Cal. App. 424, [92 Pac. 360].

There is no force in the point sought to be extracted from the proposition that the defendants, Darlington, Stern, Blaney, and Fletcher are sued as individuals, and that the verdict is against them as such, and not as state officers. Conceding that they were sued individually, and not as state officers, and that, therefore, the verdict affects them only as individuals, yet it is obvious that that fact would not make the corporation any the less an independent contractor, solely responsible for any ill consequences resulting to third parties from any negligence of which it might be guilty in performing its obligations under the contract.

For the various reasons herein set forth, the judgment appealed from is reversed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 10, 1919.

All the Justices concurred.