[Civ. No. 2087. Third Appellate District.—March 29, 1920.]

TILLIE BARTON et al., Respondents, v. STUDEBAKER CORPORATION OF AMERICA et al., Appellants.

[1] MASTER AND SERVANT—OPERATION OF AUTOMOBILE BY SALESMAN—INDEPENDENT CALLING.—In this action against an automobile company and one of its salesmen, and others, for damages sustained by plaintiff when an automobile in which she was riding, driven by such salesman, overturned, the evidence disclosing the nature of the contractual relationship between the automobile company and such salesman was undisputed, and it was clear therefrom that the relation of master and servant, within the legal definition of that relation as given by section 2009 of the Civil Code, did not exist between them at the time of the accident, but that such salesman was exercising an independent calling.

[2] ID.—INDEPENDENT CONTRACTOR — TEST.—The real test as to whether a person is an independent contractor or a servant is whether the person alleged to be the master, under his arrangement with the other party, has or has not any authoritative control of the latter with respect to the manner in which the details of the work are to be performed, and, therefore, this test or element must, in the last analysis, always determine what was the essential nature of the relationship between the person who performed the given work and the person for whom it was performed.

[3] ID.—DEFINITION OF INDEPENDENT CONTRACTOR.—An independent contractor is one who, in rendering service, exercises an independent employment or occupation, and represents his employer only as to the results of his work, and not as to the means whereby it is to be accomplished. The chief consideration which determines one to be an independent contractor is the fact that the employer has no right of control as to the mode of doing the work contracted for.

[4] ID.—TEST OF CONTROL.—The test of control in such cases means complete control or the full and unqualified right to control and direct the details or of the means by which the work is to be accomplished.

[5] ID.—USE OF SALESROOM — AUTHORITY EVIDENCED BY CARD — EVIDENCE.—Neither the fact that a salesman uses the rooms of an automobile company's plant for showing automobiles to prospective customers he secures, nor the fact that his authority to act for the automobile company is evidenced by a printed card of the latter on which his name is printed, but on which the character of the relation maintained by him to the automobile company is not stated, possesses any significance as showing the nature of the contractual relationship between the parties, where the undisputed evidence discloses the terms of the agreement between them and thus the nature of the relationship which said agreement established between them.

[6] ID.—TORTS OF SERVANT — LIABILITY OF MASTER — OSTENSIBLE AGENCY.—A master can be held liable for a tort committed by his servant in the course of his employment as such servant only upon the doctrine of *respondeat superior*—that is, upon the theory that the torts of a servant committed while the latter is engaged in the performance of the duties of his employment·are the torts of the master himself. Therefore, in applying the doctrine of ostensible agency to torts, the case must be characterized by such peculiar and exceptional circumstances as that it is necessary to invoke an estoppel to prevent manifest injustice from being done.

2. Who is independent contractor, notes, 19 **Ann. Cas.** 3; Ann. Cas. 1913B, 573; Ann. Cas. 1916D, 222; Ann. Cas. 1918C, 627, 663, 669, 672.

[7] ID.—EVIDENCE—OSTENSIBLE AGENCY DOCTRINE INAPPLICABLE.—In this action against an automobile company and one of its salesmen, and others, for damages sustained by plaintiff when an automobile in which she was riding, driven by such salesman, overturned, there was no room for the application of the doctrine of an ostensible relationship between the automobile company and such salesman, but the relationship existing between them when the accident occurred had to be determined upon the actual facts, and the actual relationship existing between them, as disclosed by the evidence.

[8] NEGLIGENCE—USE OF ORDINARY CARE—AUTOMOBILE ACCIDENT—INSTRUCTION.—In this action for damages for personal injuries sustained when an automobile in which plaintiff was riding overturned while attempting to pass another machine, an instruction in effect that the driver of the latter machine would not be liable to plaintiff if, in reliance upon the assumption that any automobile approaching her from the rear would be operated with reasonable care and a reasonable rate of speed, etc., she "acted with ordinary care," did not involve an erroneous statement of the rule, when considered in connection with the instructions explaining the provisions of the statute and the local ordinance regulating the operation of motor vehicles.

[9] ID.—TURNING TO LEFT—RIGHT OF WAY—PROPER INSTRUCTION.—An instruction "that a vehicle, turning to the left in an intersection and passing the center of the highway in making such turn, has the right of way over any vehicle which it may have preceded into such intersection, and which may be to the left of said vehicle so turning," stated a correct rule of law as applied to the facts of this case, although it might not have been correct as an abstract enunciation of the rule to be observed in such instance prescribed by the ordinance of the city of Los Angeles.

[10] ID.—VEHICLES TRAVELING IN SAME DIRECTION—DUTY OF DRIVER OF REAR CAR.—Where two vehicles are traveling in the same direction on the same street, one in the rear of the other, it is the duty of the driver of the rear car to exercise reasonable care with respect to the forward car, and if the driver of the latter indicates by the proper signal his intention of turning to the left into another or cross street, to yield to him that right.

[11] ID.—CONSTRUCTION OF INSTRUCTION AS WHOLE—ABSENCE OF REVERSIBLE ERROR.—Where the charge to the jury as a whole appears to embrace a fair and reasonably accurate statement of all the principles of law applicable to the case as made by the pleadings and the proof and such a statement as was calculated

10. Law of road as to vehicles going in same direction, notes, Ann. Cas. 1913A, 833; Ann. Cas. 1918E, 562.

to lead the jury to a just and enlightened consideration of the evidence, the judgment will not be reversed because certain of the instructions were not as clearly framed as they should have been.

APPEAL from a judgment of the Superior Court of Los Angeles County. Frederick W. Houser, Judge. Reversed in part; affirmed in part.

The facts are stated in the opinion of the court.

Gurney E. Newlin, A. W. Ashburn and Dave Smith for Appellants.

B. J. Bradner and Seward A. Simons for Respondents.

HART, J.—The action was brought to recover damages for personal injuries sustained by plaintiff Tillie Barton in an automobile accident. Plaintiff Henry Stephen Barton is her husband. A jury found in favor of plaintiffs and against defendants, Studebaker Corporation of America, and D. V. Owen, and assessed the damages at the sum of ten thousand dollars. From a judgment in this amount said defendants, the corporation and Owen, prosecute this appeal.

Vermont Avenue, in the city of Los Angeles, runs north and south and there are double car tracks thereon over which street-cars are run. Pico, or 13th Street, intersects Vermont Avenue at right angles, running east and west. Next on the north is 12th Street, which runs westerly from Vermont Avenue, being closed to the east.

On the twenty-eighth day of January, 1916, defendant, Lila Parker, was driving north on Vermont Avenue in an electric automobile, accompanied by her sister, Mrs. Rosa. Defendant Owen was driving a Studebaker gasoline automobile, also in a northerly direction, and was accompanied by Mrs. Barton. A street-car was proceeding northerly on the easterly car track. Owen passed the street-car at a point about half-way between 13th and 12th Streets and overtook the electric, driven by Mrs. Parker, at a point very near 12th Street. He was about to pass the electric when Mrs. Parker turned suddenly to the left. Owen also swerved to the left, but the right front fender and the forward portion of the

running-board on his car struck the electric, with the result that the Studebaker car was overturned on a steep incline and Mrs. Barton suffered severe injuries.

It is stated in appellants' opening brief: "While we do not believe that the evidence was sufficient to justify a finding that the accident was due solely or at all to negligence of Owen, and while we do believe that the verdict is excessive, we shall not argue those points separately, because of the established principle of review which must apply thereto. We will, however, call attention to the meager nature of the evidence in connection with our argument as to errors of law."

Appellants' first contention is that the evidence is insufficient to support the jury's finding that the defendant Owen was the employee of defendant Studebaker Corporation.

The evidence as to the relationship between Owen and the corporation is quite voluminous. We will state, as briefly as possible, a synopsis thereof.

A. P. Drayton, who for two years had been cashier of the Studebaker Corporation, was called as a witness on behalf of plaintiffs and testified: "Mr. Owen has been commission salesman as far back as I know anything about the records, which is about for two years, up to the present time. When I came here I found him as a commission salesman. He had no particular desk that he used other than any other salesman would use. . . . There was a desk which he could use if he saw fit. I have never seen him use it, not particularly—I couldn't remember whether I saw him use it or not. I have frequently seen Mr. Owen in the office and premises of the Studebaker Company during the time that I have been there. . . . The company has literature and advertising matter which is sent out to their prospects. . . . We keep a ledger account with Owen. I found one there when I came into the position of cashier and have kept it even since. . . . We furnish business cards with the agent or salesman's name on it. We did that for Mr. Owen as far back as January, 1916. . . . I have the account of Owen covering the period from 1916 down to the present time. The following card was furnished by Studebaker Corporation to Mr. Owen:

" 'Home 60439
" 'Main 3640

" 'Studebaker

" 'THE STUDEBAKER CORPORATION OF AMERICA
               " 'Los Angeles Branch
" 'D. V. Owen.                    1047 So. Grand Ave.'

"The Studebaker Company did not furnish oil and gas to Mr. Owen at any time prior to the accident. The sheet which I have is headed 'Accounts Receivable Ledger.' It is used for any ledger work. The word 'Employees' simply means that that is the title of the account. The name 'Dan V. Owen' indicated the defendant. . . . The debit items which occur continuously from the 1st of October, 1915, down to and including the first day of February, 1916, represent gasoline, oil, and grease commissions charged back by default on contract, which should be borne and paid for by Mr. Owen. He paid us for his oil and gas by allowing a portion of his commissions to be applied against it, or anything else which should be paid by him, by allowing that much of his commissions to be paid on it. . . . I understand that the salesmen carried regular sales contract blanks for the purpose of familiarizing themselves with them, but they are usually signed up in the office. When the prospect has reached the point where he is about to make a decision, the sale must meet with the approval of the manager and the final arrangements are made in the office and the prospect is usually there in person—when you can bring him there. That was so with Owen as with other salesmen."

On cross-examination the witness testified: "I first became connected with the company in Los Angeles in October, 1915, and Mr. Owen had been with the company a long time. . . . Mr. Owen was a commission salesman and received no salary or drawing account whatsoever. The company did not advance Mr. Owen any expenses at all. . . . The only compensation that Mr. Owen received from the company was the commission on cars that he had sold or were sold through his efforts, and if he sold no cars at all, he received nothing at all from the company. He signed no contracts for the company and closed up no deals for the company—that is, he did not accept them as final. All he did was to bring in a purchaser or prospective purchaser

and present him to the manager or assistant manager or some one in the office to sign the contract. . . . The items shown in the credit column of the ledger sheet are a summary of the commissions Mr. Owen was entitled to, from the sale of cars.''

The ledger accounts referred to by the witness were received in evidence. They are headed: ''Studebaker. Accounts Receivable Ledger. Name, D. V. Owen. Address, Employee.''

As to his relations with defendant corporation, defendant Owen testified: ''Up until July, 1915, I was floor man for Studebakers. . . . My occupation in January, 1916, was selling Studebaker automobiles, not necessarily only Studebaker automobiles; any used car of any other make that Studebaker might have owned at that time, on a compensation basis or commission only. During January, 1916, and the two or three months prior thereto I did not receive any salary from the Studebaker Corporation, only commission on cars sold by me. I would get into communication by various means with people whom I thought wanted to buy automobiles. . . . Such person was then my prospect. No one controlled me as to when I should go or when I should come. . . . I went when I thought best and where I thought best. . . . Of course, there are office hours there. If it suited me I was down at office hours and if it did not, I was not. I did not make any report to the company as to what I did during the day or what I was going to do the next day. . . . The automobile I had was owned by myself and my stepson, O. B. Sawyer. I paid the bill for repairs on the car caused by the collision. . . . I used the rooms of the Studebaker plant for showing automobiles at various times from the 15th of July, 1915, on to the time of the accident. I had been bringing people there and closing the contracts there. There is where they are closed. That is where I brought my people under the rules of the company, to close the contract. I did not close any contracts. . . . I made no written report to the Studebaker Corporation. We would sometimes go in and tell them who our prospects were and file a list in the office from time to time and they kept them on file. I used the automobile in which I was driving on that afternoon in bringing customers to the company when I saw fit. . . . I occasionally acted on the

floor of the salesroom. I watched for people to come in, found out what they wanted, answered the telephone, anything that might happen to come up to be done. If anybody wanted to see a car, showed it to them. If they wanted to buy it, I sold it to them. . . . The number of times we could be on the floor depended on how many men were working. We had the right to take turns. If I did not see fit to be on the floor, I wasn't. I went to other work if I wanted to. If we get a prospect we make a note of it and take it down to the place and file it. That entitles me to work that prospect. . . . '' On cross-examination the witness testified: ''I have been with the Studebaker since 1910 as floor man up to July, 1915. That was the designation of employees of the company who remained on the floor itself where the machines stood upon the floor for the purpose of meeting customers or people who were brought there to show the cars. Some time in July I went on a commission basis. I did not act as floor man after that time, not in the capacity that I did prior to that time, not in the same way, nor did we necessarily act at least one day in a week. I used the rooms of the plant for showing automobiles at various times from the 15th of July, 1915, on to the time of the accident. By 'we' I mean to include myself just the same as the regular salesmen, the usual salesmen, and during this period of time I had been bringing people there, that is, from the time I changed to the commission basis until the time of the accident and closing the contracts there. . . . It was one of the rules of the company that we must close deals with prospects at the office. The prospects were filed under a card system in the office. In the transaction of my business I usually ask advice of the city sales manager or some other official, the assistant manager and general manager.''

F. N. Dalton, assistant manager of the defendant corporation, corroborated, generally, the above testimony.

Section 2009 of the Civil Code thus describes a servant: ''A servant is one who is employed to render personal service to his employer, otherwise than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the latter, who is called his master.''

[1] The evidence disclosing the nature of the contractual relationship between the Studebaker Company and Owen is

undisputed, and it is clear therefrom that the relation of master and servant, within the legal definition of that relation as given by the section of the code above mentioned, did not exist between the defendant Studebaker Corporation (to be hereafter referred to as "the corporation") and the defendant Owen at the time of the accident in which the plaintiff, Tillie Barton, was injured. On the other hand, it is clear that Owen, while engaged in the business of procuring customers for the corporation at the time mentioned, was exercising an independent calling. He was, in other words, an independent contractor, and as to the means by which he was to execute or perform the work which he assumed in his engagement with the corporation to do, the latter had no control over him.

[2] The real test as to whether a person is an independent contractor or a servant is whether the person alleged to be the master, under his arrangement with the other party, has or has not any authoritative control of the latter with respect to the manner in which the details of the work are to be performed, and, therefore, this test or element "must, in the last analysis, always determine what was the essential nature of the relationship between the person who performed the given work and the person for whom it was performed." (Labatt on Master and Servant, sec. 18, p. 56.) As some evidence of the nature of the relationship existing between the corporation and Owen, in this case, we may refer to the fact that Owen received no definite compensation; that the automobile used by him for the purpose of facilitating conveniently the work he engaged himself to perform for the corporation was his property, and that he himself paid the expense of its maintenance and care and for the gasoline necessary to run it. But more important than these considerations, which really involve evidence only tending to show the relationship, the probative value of which as disclosing the nature of the relationship must, of course, be measured by other considerations more directly addressed to the fact, is the fact, clearly and unquestionably established, that his business under his engagement with the corporation was merely that of seeking and finding and procuring purchasers of its automobiles (for which service he was paid a commission) and the further fact that, in prosecuting that business or

work, he was at liberty under his engagement with the company to go where and when he please and to exercise his own judgment and discretion as to the parties whom he should seek as purchasers or to whom he might present propositions for the sale and the purchase of the corporation's automobiles. He was, in other words, perfectly free, under his engagement with the corporation, to choose his own time, place, and means of seeking and procuring purchasers. There was nothing in his agreement with the corporation to prevent him from employing assistants to aid him in the work of seeking and securing purchasers of the company's automobiles and agreeing to compensate and compensating them out of his own commissions for any customers they might bring to him. In brief, he was perfectly free to prosecute the work he agreed by his contract to do for the corporation in any manner he saw fit, using such means or methods as to his judgment might seem the most effective for accomplishing the ends of his business. When a sale was made through him he was paid his stipulated commission, but received no compensation unless a sale was effected through him. He was as much engaged in business for himself when prosecuting the work called for by his contract with the corporation as is the contractor who engages to construct a building for a stipulated sum of money, he agreeing to furnish the labor and materials and not being under the control or direction of the owner, as to the means by which he performed the contract or as to the place where he purchased the materials or as to the persons—mechanics and laborers—he employed to assist him in fulfilling the terms of his contract or as to the wages he should pay such mechanics and laborers. In such case, the limit of the owner's right to interfere in the matter of the performance of the contract is to see that the building is constructed according to the plans and specifications, in conformity with which the contractor has agreed to do the work. And in this case, the corporation could exercise no authoritative control over the work of Owen, except perhaps merely the right to require him to carry out its instructions as to the representations he should make to proposed or prospective purchasers of the character of the automobiles in mechanical construction and their durability or serviceable quality, and this authority is analogous only

to that of the owner with respect to the contractor who has contracted to erect a building upon the former's land according to certain plans and specifications.

[3] No better description of an independent contractor or a person who is engaged in performing certain acts or work for another but who, in performing such acts or work, exercises an independent calling—that is, a calling as to the means or methods of accomplishing the ends of which no right of control or direction is reserved to or vested in or exercisable by the party for whom the acts or work are to be done—is to be found than is given in *Green* v. *Soule,* 145 Cal. 96, 99, 100, [78 Pac. 337, 339], as follows: "'An independent contractor is one who, in rendering services, exercises an independent employment or occupation, and represents his employer only as to the results of his work, and not as to the means whereby it is to be accomplished. . . . The chief consideration which determines one to be an independent contractor is the fact that the employer has no right of control as to the mode of doing the work contracted for.' (16 Am. & Eng. Ency. of Law, 2d ed., p. 187.) The fact that the work is to be done under the supervision of an architect, or that the employer has the right to make alterations, deviations, additions, and omissions from the contract, does not change the relation from that of an independent contractor to that of a mere servant. (16 Am. & Eng. Ency. of Law, 2d ed., p. 187; *Frassi* v. *McDonald,* 122 Cal. 402, [55 Pac. 139, 772].) These principles apply 'likewise in favor of the principal contractor as against any liability on his part for the acts of a subcontractor, or of any liability on his part for the acts of a subcontractor, or of a subcontractor's servants.' (16 Am. & Eng. Ency. of Law, 2d ed., p. 194, and cases cited.)'' (See, also, *Buckingham* v. *Commary-Peterson Co. et al.,* 39 Cal. App. 154, [178 Pac. 318, 325–326]; *Bennett* v. *Truebody,* 66 Cal. 509, [56 Am. Rep. 117, 6 Pac. 329]; *Callan* v. *Ball,* 113 Cal. 593, [45 Pac. 1017]; *Louthan* v. *Howes,* 138 Cal. 116, [70 Pac. 1065]; *Johnson* v. *Helbing,* 6 Cal. App. 424, [92 Pac. 360].)

[4] The test of control in such cases means "complete control" or the full and unqualified right to control and direct the details of or the means by which the work is to be accomplished. (*Western Indemnity Co.* v. *Pillsbury,* 172 Cal. 807, 811, [159 Pac. 721]; see, also, *Western Metal*

*Supply Co.* v. *Pillsbury,* 172 Cal. 407, 417, [Ann. Cas. 1917E, 390, 156 Pac. 491] ; Wood on Master and Servant, sec. 317; concurring opinion of Mr. Justice Shaw, in *Brown* v. *Industrial Acc. Com.,* 174 Cal. 457, [163 Pac. 664, 665] ; *Giacomini* v. *Pacific Lumber Co.,* 5 Cal. App. 218, 221, [89 Pac. 1059] ; *Singer Mfg. Co.* v. *Rahn,* 132 U. S. 518, [33 L. Ed. 440, 10 Sup. Ct. Rep. 175, see, also, Rose's U. S. Notes] ; *Standard Oil Co.* v. *Anderson,* 212 U. S. 215, [53 L. Ed. 480, 29 Sup. Ct. Rep. 252] ; *Chicago etc. Ry. Co.* v. *Bond,* 240 U. S. 449, [60 L. Ed. 735, 36 Sup. Ct. Rep. 403] ; *Fink* v. *Missouri ·Furnace Co.,* 82 Mo. 276, [52 Am. Rep. 376, 378] ; 2 Thompson on Negligence, 899, sec. 22; *Fay* v. *German Gen. Ben. Soc.,* 163 Cal. 119, 121, [124 Pac. 844] ; *Premier Motor Mfg. Co.* v. *Tilford,* 61 Ind. App. 164, [111 N. E. 645] ; *Goodrich* v. *Musgrave Fence & Auto Co.,* 154 Iowa, 637, [135 N. W. 58].)

In the case of *Chicago . etc. Ry. Co.* v. *Bond, supra,* the intestate of plaintiff in the trial court, one Turner, was engaged under certain contracts with the railway company to perform certain services for the company, he (Turner) to furnish all the labor required to perform the services. While Turner was walking between the car tracks of the company on his way to attend to some duty connected with his contracts, an engine, two box-cars, and a flat car, backing on one of the tracks, ran over and killed him. Damages were sued for for his death under the Employers' Liability Act of Congress, [8 Fed. Stats. Ann., pp. 1208, 1339, etc.; U. S. Comp. Stats., secs. 8657–8665] and the question was whether deceased was an employee of the company. The United States supreme court answered the question in the negative, and, among other things, said: "There was, it is true, and necessarily, a certain· direction to be given by the company, or rather, we should say, information given to Turner. But the manner of the work was under his control, to be done by him and those employed by him. . . . The power was one of control in a sense, but it was not a detailed control of the actions of Turner or those of his employees. It was a judgment only over results and a necessary sanction of the obligations that he had incurred. It was not tantamount to the control of an employee and a remedy against his incompetency or neglect."

It is to our minds a very plain proposition that, according to the evidence in this case and the criterion by which it is to be determined whether in a given case a party is a servant or an independent contractor, or one exercising an independent calling in his contractual relationship to the party for whom he has engaged to perform a certain service, the defendant Owen and the corporation defendant did not, at the time the injuries complained of were received, maintain the relation of master and servant, but that Owen was then attending to and managing his own business—that is, engaged in performing work for himself, of course, under his contract with the corporation.

[5] But the fact is emphasized, as showing that Owen was the servant of the corporation, that the former used the rooms of the corporation's plant for showing automobiles to prospective customers he secured. That fact possesses no significance as showing the nature of the contractual relationship between the parties. We apprehend that there was no other place where the automobiles could be as conveniently exhibited to customers or those contemplating purchasing than at the rooms or in the building where the machines were kept on sale. Owen's engagement was to seek, secure, and bring to the corporation purchasers of its automobiles, and when taking them to the plant it was only an act which he was required to do to accomplish the work he had assumed to do. If a person should engage to haul grain to another's warehouse and place it therein at a stipulated amount per ton and agree to furnish his own equipment and labor for the doing of the work, it would not, we imagine, be contended that such person would be any the less an independent contractor merely because he was required to use the warehouse of the party with whom he made the engagement to accomplish the results required by his agreement.

Much stress is also laid upon the fact that Owen's authority to act for the corporation was evidenced by a printed card of the latter and on which Owen's name was printed. The character of the relation maintained by Owen to the corporation was not stated on the card. This is only, and no more, than an evidentiary circumstance, and, under some circumstances, it might cut some figure as proof of the nature of the relationship existing between the parties, but in this case it

possesses no significance, in view of the undisputed evidence disclosing the terms of the agreement between the parties and thus the nature of the relationship which said agreement established between them. Naturally, whether a servant or an independent contractor, a party engaged to perform for another acts or work requiring dealings with the public would carry with him some evidence of his authority to do what he claimed the right to do.

We have not thought it necessary to review herein the many cases cited by respondents in support of their position as to the nature of the relationship existing between the corporation and Owen at the time of the collision. There is one case so cited, however, which we will briefly examine here, inasmuch as counsel insist that in the facts it is precisely analogous to the case at bar. The case is *Standard Oil Co.* v. *Parkinson*, 152 Fed. 681, [81 C. C. A. 29]. In that case the injury complained of was caused by the negligent act of one Perry, who had a contract with the defendant to sell and deliver oil in four different towns, and who was to receive as his compensation one cent per gallon for each gallon so sold and delivered. During the existence of this contract the company ordered Perry to deliver oil to its customers in a town other than any of those included in the contract of employment. It was while Perry was obeying this order that the accident occurred and the injuries were received. The fact that Perry was shown to be subject to the orders of the defendant as to when and where and to whom he should deliver the oil was, with the other facts, sufficient to uphold the finding of the jury that Perry, at the time of the accident, was acting as a servant of the defendant. In this case, as the undisputed evidence shows, the defendant Owen was not subject to the authoritative control of the corporation in respect of the details of his work or as to how it should be performed. This was entirely up to him. He could work when he pleased and seek out and select such persons as he pleased as purchasers of the automobiles of the corporation. Indeed, he was so far from being subject to the control or direction of the corporation as to the means or mode of and the time for doing his work that he was under no obligation to give any particular time or service to the corporation. When he brought a ''prospect'' to the corpora-

tion, he was acting for himself as well as for the corporation, and if such prospect was transformed into a purchaser, he received his stipulated share of the money for which the machine was sold, and nothing if a sale was not effected. It is manifest that there is a marked distinction as to the facts between the two cases.

But the theory is advanced by the respondents that an ostensible agency or the ostensible relation of master and servant between Owen and the corporation was shown to exist at the time of the accident. The point is argued in respondents' brief exhaustively and authorities are cited in support of that theory as applicable to the instant case.

The doctrine of ostensible agency rests in estoppel *in pais* or by conduct. It is applicable in particular to contractual obligations and generally invoked in actions sounding in contract and not in those sounding in tort. There are, however, some cases in tort in which the doctrine of ostensible agency has been applied, and the one upon which the respondent here principally relies is that of *Donnelly* v. *San Francisco Bridge Co.*, 117 Cal. 417, [49 Pac. 559]. In that case the defendant company had taken a contract to construct a pier on the beach near the Cliff House, in the city of San Francisco. One Stone was the superintendent of the company and was in immediate charge of the work. The plaintiff was employed by the company through Stone, its superintendent. The plaintiff was engaged in working on the pier and was sent by the superintendent, with other employees, to lay a foundation for a jack-screw to raise a pile which had been driven too deep. The blocks were thrown down from a place some twelve feet above where plaintiff was working, and as he stooped to pick up a block he was struck by one thrown from above. Before throwing the block the man who did it asked if all was clear below and was answered in the affirmative by the superintendent and others, and the block was thrown below. At the trial, the defendant company attempted to show that it had, previously to the accident, transferred the contract to Stone, its superintendent, and that when the accident occurred it had nothing whatever to do with the contract or the work of constructing the pier. In rebuttal of this defense, the plaintiff was permitted to show, and did show, that Stone "continued at least to be the ostensible agent of the defend-

ant in charge of the work. . . . He showed that no notice was ever given to him of the pretended change of his employers; that the work was conducted under the direction of Stone after the date of the contract in precisely the same manner as that which characterized it before.'' The court said: ''An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent, who is really not employed by him. (Civ. Code, sec. 2300.) There is shown in this case an existing agency, a recent termination of it under circumstances designed to transform an agent into the principal and this without any knowledge or means of knowledge of the changed conditions afforded to those who had taken original employment under the defendant. The doctrine of ostensible agency draws its support from the equitable principles of estoppel *in pais,* and it would not be easy to call to mind a clearer instance of ostensible agency than that here presented by the evidence.''

The proposition decided in that case could have been disposed of upon the hypothesis that the question whether the defendant was still the principal or master of the plaintiff when the latter received his injuries was one for the jury to determine upon the evidence, and that the evidence, though conflicting, was sufficient to support the theory of the plaintiff that the defendant had not transferred its contract to Stone and was still the employer of plaintiff. But readily it may be perceived how the doctrine of ostensible agency may well be invoked in a case of such circumstances as those of the Donnelly case, but there is to be noted a marked distinction between that case and this in the facts—a distinction which renders the former case of no force as an authority here. In the Donnelly case the plaintiff's contract of employment was originally with the defendant. He had no notice of the transfer of the contract which he had been employed to aid in performing, if there was, in fact, any such transfer. A contract of employment presupposes the existence of a number of considerations or elements. It presupposes that the laborer or servant desired to work or perform services for the particular person by whom he was employed. He is entitled to know definitely for whom he has engaged himself to perform labor. He is entitled to know the responsible party. If he should find that he was

not in the employ of the person by whom he was led to believe when he entered into the contract of employment that he was employed, he might, for reasons sufficient to his mind, cease to labor or to perform the services he had agreed to do or perform. In the Donnelly case, if there was a transfer to Stone by the defendant of the contract whereby the pier was to be constructed, the laborers employed on that work were entitled to notice of such transfer, so that they might be given an opportunity to determine whether they would continue in their employment, so that they would know to whom they should look for their compensation and know who was the responsible party in case controversies of any character should grow out of the work of performing the contract. In this case the plaintiff was not an employee either of the corporation or Owen. It was of no interest to her to know whether Owen was a servant of the corporation or, in the sale of the latter's automobiles, was exercising an independent calling. The only interest she could have in the nature of Owen's contractual status with respect to the corporation was that he was vested with authority to solicit her trade for the corporation and to consummate a sale of an automobile upon the terms of his agreement with her. It is not shown that she was influenced in the least degree to ride with Owen because she believed that he was the servant of the corporation. It is undoubtedly true that she never gave any thought whatever to the nature of the business relation existing between Owen and the corporation.

[6] A master can be held liable for a tort committed by his servant in the course of his employment as such servant only upon the doctrine of *respondeat superior*—that is, upon the theory that the torts of a servant committed while the latter is engaged in the performance of the duties of his employment are the torts of the master himself. Therefore, in applying the doctrine of ostensible agency to torts, the case must be characterized, as was true in the Donnelly case, *supra*, by such peculiar and exceptional circumstances as that it is necessary to invoke an estoppel to prevent manifest injustice from being done. The authority for applying the principle of equitable estoppel in such a case is statutory, and is found in section 2330 of the Civil Code. That section reads: "An agent represents his principal for all

purposes within the scope of his actual or ostensible authority, and all the rights and liabilities which would accrue to the agent from transactions within such limit, if they had been entered into on his own account, accrues to the principal.'' But the case of *Smith* v. *Belshaw,* 89 Cal. 427, [26 Pac. 834] is a direct authority against the position of respondent, and between that case and the Donnelly case we perceive no inconsistency.

In the *Smith* v. *Belshaw* case the defendant was the owner of a coal mine in which the plaintiff was employed and while so employed received the injuries to secure compensation for which he brought the action. The evidence was ''undisputed that at the time of the accident and for some months prior thereto, the mine was in the exclusive possession and control of defendant Dickenson, under a contract with Belshaw, who was the owner thereof; that under such contract Dickenson employed and paid the workmen, had entire control of and authority over the mine, and received a fixed rate per ton from Belshaw for the coal taken therefrom, when the same was delivered to him.'' The court, answering the several contentions of respondent which were advanced to support the judgment against Belshaw, said: ''The fact that the miners were paid their wages at defendant Belshaw's store, where they had been paid prior to the contract with Dickenson; and the further fact that some of the miners *thought* they were working for Belshaw, are circumstances too slight to defeat the express and uncontradicted testimony as to the terms of the contract and the labor performed under it.

''What the *miners thought* as to who was their employer is entirely immaterial. There is no question of estoppel involved in the case, and appellant, in order to escape liability for the negligence of Dickenson, was not bound to give any notice to the miners that he had given up control of the mine. This is not an action on contract based upon ostensible agency, but is an action in tort, and *must rest upon the actual facts, and the actual relations existing between the parties.* (*Samuelson* v. *Cleveland Iron M. Co.,* 49 Mich. 164, [43 Am. Rep. 456, 13 N. W. 499]; *Rourke* v. *White Moss Colliery Co.,* L. R. 2 C. P. D. 206.)'' (Latter italics ours.)

*Smith* v. *Belshaw* was approved in *Houghton* v. *Loma Prieta Lumber Co.*, 152 Cal. 574, [93 Pac. 377], and *Raftis* v. *McCloud River Lumber Co.*, 35 Cal. App. 397, [170 Pac. 176]. In the last-named case it is said: "The case of *Donnelly* v. *San Francisco Bridge Co.*, 117 Cal. 417, [49 Pac. 559], in no way militates against this conclusion. In that case the evidence showed a clear case of ostensible agency. The prior relations between the parties to the action created a duty upon the defendant therein to notify the plaintiff that their former foreman had become an independent contractor."

The respondents cite other cases, but therein the doctrine of ostensible agency as applied to torts did not arise. · In most of said cases it is merely held that where there is conflicting evidence upon the question as. to the nature of the relationship existing between the parties, upon the familiar rule respecting a substantial conflict in the evidence addressed to a vital issue of fact, the findings of the court or the verdict of the jury will not be disturbed on review. This · is really in effect what is held in *Raftis* v. *McCloud River Lumber Co.*, *supra,* and in *Giacomini* v. *Pacific Lumber Co.*, *supra.*

[7] We are convinced that there is no room in this case for the application of the doctrine of ostensible relationship, and that the nature of the relationship existing between the corporation and Owen when this accident occurred must be determined, as is said in *Smith* v. *Belshaw, supra,* "upon the actual facts, and the actual relationship existing between the parties," as disclosed by the evidence.

We will now leave that branch of the case and proceed to an examination of some of the other assignments.

The rulings respecting the evidence of which complaint is made need not be noticed herein, inasmuch as they affected the question only of the nature of the contractual relation existing between the corporation and Owen at the time of the accident. Certain given instructions, however, affecting the case of Owen are criticised, and to the criticism of some of these only do we deem it necessary to give special attention herein.

It is deemed proper first to say that the evidence abundantly supports the verdict as against the defendant, Owen. Indeed, the evidence clearly shows that, just prior and

down to the very moment the collision occurred, Owen was driving his machine apparently with reckless indifference to the rights of pedestrians and others using the street at the time of the collision.

[8]   The following is one of the instructions to which objection is urged by the appellants: "Defendant Mrs. Parker had a right to assume, until actually aware of the contrary, that any automobile approaching her from the rear would be operated with reasonable care and at a reasonable rate of speed and with the exercise of reasonable caution in giving warning of its approach if reasonable prudence so required, and Mrs. Parker had a right to act on that assumption until actually aware of its violation.   And if, in proper reliance on that assumption Mrs. Parker acted with ordinary care, your verdict must be given in favor of defendants Parker."

The converse of the proposition stated in said instruction was embodied in an instruction requested by the defendants, but the court, in view of its position as shown by the above instruction, rejected it.

The state motor vehicle law, as does, substantially, a local regulation of the city of Los Angeles, provides that the driver or "person in charge of any vehicle in or upon any public highway, before turning, stopping, or changing the course of such vehicle, and before turning such vehicle when starting the same, shall see first that there is sufficient space for such movement to be made in safety, and if the movement or operation of other vehicles may reasonably be affected by such turning, stopping or changing of course, shall give plainly visible or audible signal to the persons operating, driving, or in charge of such vehicles of his intention so to turn, stop, or change his course."   (Subd. J, sec. 20, Stats. 1915, p. 408.)

It is said that a similar instruction was held to be error and prejudicial in the case of *Starck* v. *Pacific Ry. Co.*, 172 Cal. 277, 278, 281, [L. R. A. 1916E, 58, 156 Pac. 51].   In that case, the instruction as it is given in the opinion read: "In determining whether plaintiff was negligent, you will take it that she had the right to assume, until she knew to the contrary, that defendant would not violate the city ordinance and run at a speed over twenty miles per hour."

We should think that it is correct to say that every person using the public streets and highways for the purposes

for which they are established and maintained has the right to assume that other persons using such streets and highways for the same purpose will, when so using them, obey the law regulating their use by pedestrians and drivers of vehicles of any kind. But this is not to say that any person, whether pedestrian or the driver of a vehicle, when using such thoroughfares for the purposes they are intended for is not also himself required to exercise due care for his own safety or to observe the duties with which the law expressly charges him. (*Runnels* v. *United Railroads*, 175 Cal. 528, 531, [166 Pac. 18]; *Scott* v. *San Bernardino Tract Co.*, 152 Cal. 604, 610, [93 Pac. 677].) And, as we read the opinion of Mr. Justice Melvin, in *Starck* v. *Pacific Elec. Ry. Co.*, *supra*, what we here say is in effect what is said there. As is to be observed from the language of the State Motor Vehicle Act above quoted herein, there are certain duties imposed upon a person in charge of a motor vehicle who may be in the act of turning or about to turn his machine when driving over a public thoroughfare, and these he is required to discharge, notwithstanding that he has the right to assume that other persons who may be affected by the act of turning will do their duty or obey the law, and in any case where the driver of a vehicle violates the requirements of the law regulating the use of the public thoroughfares, the violator is guilty of negligence *per se*, if there be damage done as a result, even though it may transpire that such negligence is not the proximate cause of such damage.

The instruction in this case, it will be noted, declared that Mrs. Parker, driver of the electric car with which Owen's machine collided, had the right to assume that any automobile approaching her from the rear would be operated with reasonable care and at a reasonable rate of speed, etc., and then adds that "if, in proper reliance on that assumption, Mrs. Parker *acted with ordinary care,* your verdict must be given in favor of the defendants Parker." If by the phrase "acted with ordinary care" the court intended to refer to the care as applied to drivers of motor vehicles specifically standardized by the statute, then the instruction, although not as clearly phrased as it should be, would not involve an erroneous statement of the rule. And we think it is, when considered in connection with the instructions explaining the provisions of the statute and the local ordi-

nance regulating the operation of motor vehicles, reasonably susceptible to that construction, and that we may fairly assume that the jury so understood it; and the instruction as so construed does not conflict with instruction No. 12, given at the request of the defendant.

[9]   The court instructed as follows in instruction No. 17: "You are instructed that a vehicle, turning to the left in an intersection and passing the center of the highway in making such turn, has the right of way over any vehicle which it may have preceded into such intersection, and which may be to the left of said vehicle so turning."

Said instruction, it is contended, does not state the law correctly, and as an abstract enunciation of the rule to be observed in such instances prescribed by the ordinance of the city of Los Angeles it may not.   But, as applied to the facts of the present case, it states a correct rule.

Section 41 of said ordinance provides: "The driver of a vehicle turning to the left from one street into another street shall allow the right of way to vehicles traveling in the direction in which such vehicle is turning; and the driver of any vehicle traveling in the direction in which such vehicle is turning shall have the right of way over such vehicle so turning."

[10]   As we understand that provision, when a driver of a vehicle turns to the left into a street on which another vehicle is traveling in the direction of the former, the driver turning to the left must yield the right of way to the driver thus traveling in his direction.   In this case, Owen was traveling on the same street on which Mrs. Parker was traveling, but was in the rear or back of the Parker machine. We can conceive of no reason or principle of law which would require the party turning to the left from one street to another to yield the right of way to the vehicle following his on the same street.   If Mrs. Parker, as she testified, gave the required signal of her intention to make the turn and otherwise exercised due care in doing so, she had the right to proceed on beyond the center of the street into which she had turned or was about to turn without yielding the right of way to another vehicle back of her, unless such vehicle was traveling in the direction in which she was turning on the street into which she was thus entering or about to enter.   Where two vehicles are traveling in the same di-

rection on the same street, one in the rear of the other, it is the duty of the driver of the rear car to exercise reasonable care with respect to the forward car, and if the driver of the latter indicates by the proper signal his intention of turning to the left into another or cross-street, to yield to him that right. Ordinance or no ordinance, the driver of the rear car would certainly be guilty of the grossest negligence if he attempted to make the same turn in such manner as to cut in on the forward car. The driver of the latter car would certainly have the ''right of way'' in such a case as between him and the driver of the rear car operating on the same street and in the same direction; and, as before stated, as applied to the facts of this case, the instruction involves a correct statement of the law and did not invade the province of the jury (as counsel contend) by taking from them the determination of a question of fact.

Instruction No. 18 is subjected to the criticism that it, too, passes upon a question of fact in that, like the instruction last above considered, it told the jury that, under certain indicated conditions, Mrs. Parker had the right of way over Owen's car. What we have said of instruction No. 17 as to a like criticism is applicable to the objection made against instruction No. 18.

[11] There are other instructions the legal soundness of which is challenged. We have examined them with care, and while it may be conceded that they are subject to just criticism because they are not as clearly framed as they should have been, we are persuaded, in view of the convincing proof of Owen's gross negligence in driving his machine at the time of the accident, and also in view of our conviction, founded in an examination of the evidence, that if he (Owen) had exercised reasonable or ordinary care in operating his machine at the time the accident would not have occurred, that the rights of Owen were not materially affected by the errors of said instructions, if, indeed, the errors were of such magnitude as to do any harm at all under any set of circumstances. At any rate, we cannot find any reason sufficient to justify us in holding that, after an examination of the entire cause, a miscarriage of justice has followed the giving of the instructions referred to. (Const., art. VI, sec. 4½; *Vallejo & Northern R. R. Co.* v. *Reed Orchard Co.*, 169 Cal. 545, 554, [147 Pac. 238].) The charge of the court

generally viewing it appears to embrace a fair and reasonably accurate statement of all the principles of law applicable to the case as made by the pleadings and the proof and such a statement as was calculated to lead the jury to a just and enlightened consideration of the evidence.

For the reasons herein given, the judgment as against the defendant Studebaker Corporation of America is reversed and the judgment as against the defendant Owen is affirmed.

Burnett, J., and Ellison, P. J., *pro tem.,* concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 27, 1920.

All the Justices concurred.