[S.F. No. 23118. In Bank. Jan. 21, 1975.]

ASSOCIATED CREDITORS' AGENCY, Plaintiff and Appellant, v. RICHARD F. DAVIS et al., Defendants and Respondents.

376

## COUNSEL

John G. Evans and Robert G. Witser, for Plaintiff and Appellant.

Fitzsimmons & Hawthorne, Edward R. Fitzsimmons, Ken Fishbach, Anthony W. Hawthorne and William L. Mahaffey for Defendants and Respondents.

## OPINION

SIMS, J.*—Plaintiff, an assignee of eight creditors who furnished

*Assigned by the Chairman of the Judicial Council.

alcoholic beverages and several creditors who furnished provisions and supplies to premises licensed in the name of defendant partners, has appealed from a judgment which denied it any recovery because the concessionaire of the bar and restaurant on the premises, who ordered and received the merchandise, was an independent operator without actual or apparent authority to obligate the licensees. The plaintiff does not seriously question the trial court's finding that there was no actual agency or authority. It contends that the licensed partners were liable as a matter of law under the constitutional and statutory provisions governing the sale, distribution, and consumption of alcoholic beverages, and that the evidence fails to support the findings that the concessionaire did not have ostensible authority to create a liability in the partners for the purchase price of the goods received.

It is concluded that the findings of no actual authority are sustained by the evidence, that there is no liability created by law, that the finding that the partners did not engage in any conduct which by implication represented to suppliers that they were operating the bar and restaurant is not sustained by the evidence because the partners did permit the concessionaire to use and post their liquor license, and that the findings which show that the suppliers did not rely on any such representation are not sustained by the evidence. The judgment must be reversed and the case remanded for reconsideration of the claims of the liquor wholesalers in the light of the principles reviewed below.

On June 10, 1966, the defendants Davis, Viviani, Spaggiari and Fitzsimmons as general partners entered into a limited partnership agreement under the name Willow Park Public Golf Course for the purpose of constructing, operating, maintaining and managing a public golf course, driving range, clubhouse and related facilities on lands which had been leased from the East Bay Regional Park District. During the ensuing months, while construction of facilities, consisting of a restaurant and bar, golf shop and locker room, proceeded, arrangements were made for the operation of the restaurant and bar.

Joe Padovan, an experienced bartender, who had a cousin employed by the Department of Alcoholic Beverage Control, ascertained that special licenses were available for facilities on public property. (See Bus. & Prof. Code, § 23824, fn. 10 below.) Padovan assisted the partners in connection with their application for a license and in securing the requisite consent of the governing board of the regional park district to

the operation of a bar on the premises. He agreed to and did put up a deposit of $6,340, which was the approximate amount paid for the license.

On September 28, 1966, the general partners recorded the limited partnership agreement with the county clerk, and in their name as general partners doing business as Willow Park Public Golf Course applied for a license for an on-sale general eating place for premises in the process of construction (see Bus. & Prof. Code, § 24044). On October 3, 1966, a letter agreement between the partnership, executed on its behalf by the general partners, and Joseph Padovan and Paul Leroy Abowd, was prepared. One copy of the agreement indicates acceptance by the latter parties on November 7, 1966, and another on December 1, 1966. The terms of this agreement, which grants Padovan and Abowd the exclusive beverage and food concession at the golf course premises, are reviewed below. On November 17, 1966, the department's investigator recommended approval of the license and a supervisor and the district administrator endorsed the approval the following day. The report refers to the contract with Padovan and Abowd in particulars set forth below.

On December 9, 1966, the license was issued. Prior to this date Padovan and Abowd had ordered and arranged for the delivery of liquors and supplies to the bar and restaurant, the former to be delivered when the license was issued. Under the agreement the concessionaires were tenants, and on Abowd's withdrawal a few months after commencing business, Padovan alone was a tenant on premises leased from the partnership. Under the terms of the agreement he not only deposited the sum paid for the liquor license, but also undertook to and did stock the restaurant and bar and furnish cash registers. He filed and advertised that he was doing business under the fictitious name "Padovan's on the Green." (See Civ. Code, former §§ 2466-2477, now Bus. & Prof. Code, §§ 17900-17930.) He obtained his own state sales tax permit, his state employer's permit, his own federal liquor dealer's stamp and his own county dance permit. He hired and fired the from 30 to 60 parttime and fulltime employees necessary to run the business, and paid their withholding and social security taxes. He received no compensation from the partners and he made all his own arrangements with respect to which food and beverage wholesalers he would deal with, ordered through himself and his employees, and paid the bills with his checks. The matches and menus bore the name in which he conducted his business, and he did his own advertising and paid a share of joint advertising with the golf course.

On January 6, 1967, an attorney for the department reviewed the agreement dated October 3, 1966, and concluded, "Such an Agreement, in order to be acceptable to the Department, should be accompanied by an application to transfer the license to the concessionaires."[1] He recommended that the supervisor who approved the license outline the policy of the department with the lawyer who was one of the general partners with a view to either amending the agreement or initiating proceedings to transfer the license. Thereafter, the department's attorney met with the partner suggested. The results arrived at are disputed and are reviewed below. In February 1968, an investigation was made and the filing of an accusation was recommended. An accusation charging the licensee with violation of section 23355 of the Business and Professions Code (see fn. 6 below) was filed March 6, 1968.

Meanwhile, Padovan had incurred financial difficulties. Among other things his safe was robbed for an alleged loss of $6,000, of which only $4,000 was covered by insurance. At his request the attorney member of the partnership prepared articles of incorporation for Padovan's on the Green which were filed with the Secretary of State on January 26, 1968. It was planned that some of the partners would advance capital necessary to keep the business afloat in return for stock. Padovan, however, preferred to keep his interest undiluted and secured private backing to stay in business. On March 30, 1968, still unable to make ends meet, he surrendered the restaurant and bar to the licensees who allegedly agreed to pay him $14,217.40, representing the cost of liquor, $10,050.50, and food, $4,166.90, in his inventory. On April 3, 1968, Julliard, Incorporated and Max Sobel, two liquor wholesalers, assigned their accounts to the San Francisco Board of Trade. The rest of the creditors involved apparently followed suit. In May each executed an assignment of its claim against the general partners, naming them and 28 fictitiously named limited partners, "Individually and dba Willow Park Public Golf Course and/or PADOVAN'S ON THE GREEN." On May 22, 1968, the Board of Trade assigned all of the claims to the plaintiff. On June 14, 1968, Padovan filed a petition in bankruptcy in which he listed the accounts the subject of this suit as unsecured claims, and the $14,217.40 allegedly due for the inventory as personal property. Notice to

---

[1]The letter recites: "My conclusion and most likely yours would be based upon the following: paragraph 2 provides for a lease of the license and attendant privileges for $2,500.00 a month; paragraphs 5, 9, 15 and 16 all provide for obligations on the part of the managers which are inconsistent with an employee-employer relationship. Additionally, paragraph 9 specifically provides that the managers, by virtue of their deposit of $6,340.00, was totally inconsistent with an employer-manager relationship."

creditors was given June 17, 1968, designating July 12, 1968, as the time for the first meeting of creditors. The present action was filed July 17, 1968, on a complaint that had been verified May 24, 1968.

In December 1968, the department wrote the attorneys for the licensees concerning a proposed stipulated settlement of the outstanding accusation, and threatening further action. The matter was finally concluded July 7, 1969, by an order accepting a fine of $500 in lieu of a 30-day suspension which had been proposed in a stipulation executed by the licensees. The department report approving the settlement recites, "The accusation alleged an ownership interest in the licensed business in persons other than those set forth on the license. The failure to disclose was never intentional, it generally being the typical situation where a food and beverage concession was granted in excess of the authority of the licensees to do so under the Alcoholic Beverage Control Act . . . ."

I

The court received evidence outlining the relationship of the licensees and the concessionaire as outlined above, and evidence concerning the manner in which each of the various wholesalers of liquor and other suppliers[2] established and maintained its account with the restaurant and bar. It made findings, reviewed below, that the defendant licensees were not liable to the creditors on the theory of actual or ostensible authority, and gave judgment for the defendants.

If from all the facts only a single inference and conclusion can be drawn to the effect that the concessionaire had the power and authority to create a liability enforceable against the defendants either because the concessionaire was the actual or ostensible agent of the licensees, or because such liability should be imposed by the law, the findings are erroneous and the judgment must be reversed. (See *Mantonya* v. *Bratlie* (1948) 33 Cal.2d 120, 128-129 [199 P.2d 677].) ■ Plaintiffs, however, are faced with the rules recently collated in *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875 [92 Cal.Rptr. 162, 479 P.2d 362], as follows: " 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial

_____

[2]At the trial evidence was produced in support of the claims of eight licensed liquor wholesalers, five food suppliers and the Pacific Gas and Electric Company. No attempt has been made to overturn on appeal the finding against the claim for gas and electricity.

evidence contradicted or uncontradicted which will support the finding of fact.' (*Primm* v. *Primm* (1956) 46 Cal.2d 690, 693, other citations omitted.)

" 'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' (*Tesseyman* v. *Fisher* (1952) 113 Cal.App.2d 404, 407, other citations omitted.) Defendants' contention herein 'requires defendants to demonstrate that there is *no* substantial evidence to support the challenged findings.' (Italics added.) (*Nichols* v. *Mitchell* (1948) 32 Cal.2d 598, 600, other citations omitted.)" (3 Cal.3d at p. 881. See also *Yanchor* v. *Kagan* (1971) 22 Cal.App.3d 544, 550 [99 Cal.Rptr. 367]; *Hartong* v. *Partake, Inc.* (1968) 266 Cal.App.2d 942, 961 [72 Cal.Rptr. 722]; and *Associated Creditors' Agency* v. *Haley Land Co.* (1966) 239 Cal.App.2d 610, 614 [49 Cal.Rptr. 1] [agency found]; and cf. *United States Credit Bureau, Inc.* v. *Cheney* (1965) 235 Cal.App.2d 357, 360 [45 Cal.Rptr. 525]; *Creditor Bureau of San Diego* v. *Beach* (1956) 144 Cal.App.2d 439, 444 [301 P.2d 87]; *Freitas* v. *Marsh* (1945) 70 Cal.App.2d 711, 713 [161 P.2d 565]; and *Barton* v. *Studebaker Corp. of America* (1920) 46 Cal.App. 707, 725 [189 P. 1025] [finding no agency].) It is, therefore, necessary to review the evidence to determine whether it supports the findings of the trial court with respect to actual and ostensible authority, and whether the uncontradicted facts reveal circumstances under which liability should be imposed as a matter of law.

## II

The trial court concluded that there was no actual authority existing between defendants and Padovan as to the operation of "Padovan's on the Green." This conclusion was predicated upon findings which recite that at all relevant times the bar and the restaurant at the Willow Park Public Golf Course were operated entirely by Padovan under the trade name of "Padovan's on the Green" pursuant to an agreement between Padovan and the defendants which by its terms indicated that Padovan was an independent operator conducting his own business as a tenant under his own name. The court further found that Padovan did not have actual authority from defendants to buy liquor or food from the assigning creditors for the account of defendants.

An actual agency exists when one person is really employed to represent another. (See Civ. Code, §§ 2295, 2298 and 2299.) "Actual

authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." (*Id.*, § 2316; *Tomerlin* v. *Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 643 [39 Cal.Rptr. 731, 394 P.2d 571].)

██ The foregoing findings and conclusions are not directly attacked. The agreement granted Padovan and Abowd who was to act as fulltime chef and, in the event of Padovan's absence, as manager,[3] the exclusive beverage and food concession at the golf course premises for a term of three years with an option for renewal for an additional term of two years and a promise to negotiate for a further extension. The concessionaires agreed to pay a minimum rent of $2,500 monthly or 6 percent of their gross receipts, whichever was greater, and an additional 2 percent to the East Bay Regional Park District. The concessionaires undertook to pay for all liquor, glassware, silverware carts, trays and linens necessary to completely stock and establish all the beverage and food facilities to an estimated cost of $30,000, and to furnish cash registers and other necessary equipment with the exception of fixtures. The defendants undertook to install all fixtures, chairs, tables, carpets and drapes to an estimated cost of $75,000, including all kitchen equipment affixed to the premises. The concessionaires agreed to pay all governmental charges and taxes attributable to their ownership or business functions directly related to the food and beverage portions of the business, to furnish public liability and workmen's compensation insurance, and to pay 85 percent of the fire insurance which represented the premium for the portion of the premises used by the concessionaires.

There is no evidence that the defendants, or any of them ever directly undertook to order or to pay for beverages or provisions furnished the restaurant and bar, or that any of the assigning creditors ever directly approached any of the defendants to either solicit an order or to collect an account. The trial court found accordingly. Moreover the manner in which Padovan operated the bar and restaurant, which is reviewed below, was consistent with his contractual status as an independent concessionaire. No actual agency was established. (See *Teachout* v. *Bogy* (1917) 175 Cal. 481, 488 [166 P. 319]; *Weichman* v. *Vetri* (1952) 113 Cal.App.2d 717, 719 [248 P.2d 783]; *Weichman* v. *Vetri* (1950) 100 Cal.App.2d 177, 180 [223 P.2d 288]; *Traders C. Corp., Ltd.* v. *Radin & Kamp, Inc.* (1933) 131 Cal.App. 479, 480 [21 P.2d 461]; *Barton* v.

---

[3]The chef apparently withdrew from the operation in 1967. He was not made a party to the present action.

*Studebaker Corp. of America, supra,* 46 Cal.App. 707, 714-719; and *Raftis v. McCloud River Lumber Co.* (1917) 35 Cal.App. 397, 399-401 [170 P. 176]. Cf. *Tomerlin* v. *Canadian Indemnity Co., supra,* 61 Cal.2d 638, 644; *Associated Creditors' Agency* v. *Haley Land Co., supra,* 239 Cal.App.2d 610, 614; *Farmer Brothers Co.* v. *Kiernan* (1957) 149 Cal.App.2d 867, 868-869 [309 P.2d 69]; *Wahyou* v. *Kiernan* (1956) 145 Cal.App.2d 443, 445 [302 P.2d 638]; and *Luce* v. *Sutton* (1953) 115 Cal.App.2d 428, 432-433 [252 P.2d 352].)

■ It is suggested that the partners are liable to the creditors as the undisclosed principals of Padovan. (See *Geary St. etc. R.R. Co.* v. *Rolph* (1922) 189 Cal. 59, 64 [207 P. 539]; *Standard Oil Co. of Cal.* v. *Doneux* (1961) 192 Cal.App.2d 608, 611 [13 Cal.Rptr. 749]; *Nels E. Nelson, Inc.* v. *Tarman* (1958) 163 Cal.App.2d 714, 727-728 [329 P.2d 953]; *Gardiner* v. *Gaither* (1958) 162 Cal.App.2d 607, 618 [329 P.2d 22]; *Wahyou* v. *Kiernan, supra,* 145 Cal.App.2d 443, 445; and 1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, § 147, pp. 749-750.) In the absence of proof of actual agency there can be no reliance on that doctrine. Moreover it may be noted that insofar as any creditor was aware of the existence of the partnership and elected to deal and supply merchandise on the sole credit of the concessionaire, to the exclusion of any claim it might have against the partnership, such creditor might be precluded from recovery against the partnership even if an actual agency existed. (See Civ. Code, § 2335; *Southern Glass Co.* v. *Dairy Service Co.* (1936) 11 Cal.App.2d 498, 501 [54 P.2d 50]; *Rigney* v. *De La Salle Institute* (1935) 10 Cal.App.2d 492, 496-499 [52 P.2d 579]; and Witkin, *op.cit.,* § 148, p. 750; but cf. *Geary St. etc. R.R. Co.* v. *Rolph, supra,* 189 Cal. 59, 64-68; *Standard Oil Co. of Cal.* v. *Doneux, supra,* 192 Cal.App.2d 608, 614-615; *Higgins* v. *Standard Fed. Sav. & Loan Assn.* (1961) 188 Cal.App.2d 68, 76 [10 Cal.Rptr. 200]; *Gardiner* v. *Gaither, supra,* 162 Cal.App.2d 607, 618; *Wahyou* v. *Kiernan, supra,* 145 Cal.App.2d 443, 445; *Luce* v. *Sutton, supra,* 115 Cal.App.2d 428, 433; and *Imperial Valley Box Co.* v. *Reese* (1951) 105 Cal.App.2d 401, 403 [233 P.2d 629].)

In the latter connection the court found: "Creditors dealt with Padovan as the party to whom they were extending credit, and continued to make sales to him even after he became delinquent in his accounts, without making any inquiry of Defendants as to their responsibility or any notice to Defendants that they considered Defendants responsible"; and "Creditors chose to deal with Padovan, to extend credit to him, and to look to him for payment during the course of the relationship of

creditor and debtor and not to deal with said Defendants nor to look to said Defendants for payment during such period, even though creditors knew that Defendants were the named owners of the on-sale liquor license for the premises." The court concluded, "Said Defendants were not the 'undisclosed principals' for Padovan in the operation of Padovan's on the Green." These findings are sustained by substantial evidence. (See evidence reviewed part IV below.)

## III

The principal contention advanced on behalf of the creditors who supplied alcoholic beverages and foodstuffs to the restaurant and bar is that the partnership is liable as a matter of law for the obligations incurred in the operation of that business under the constitutional and statutory provisions governing the manufacture, distribution and sale of alcoholic beverages, because the partnership permitted its license to be used to conduct that operation. The assignee relies on cases which purport to recognize the following concept: "Generally, an agency may be created or arise by operation of law, as well as by express contract or assent of the parties, . . ." (2A, C.J.S., Agency, § 58, p. 637. See also 3 Am.Jur.2d, Agency, § 19, p. 430.) Of the nine decisions which are cited only one has any bearing on the facts of the present case.[4]

*Gipson* v. *Davis Realty Co.* (1963) 215 Cal.App.2d 190 [30 Cal.Rptr. 253] involved a tort claim against a real estate broker which arose out of an automobile accident involving a real estate salesman employed by the broker. One issue was whether the salesman was an agent of the broker or an independent contractor. The question of the status of the salesman had been left to the jury under instructions which, after defining the

---

[4]Of the remaining eight cases only four found any agency to exist. In *Allen* v. *Minnesota Loan & Trust Co.* (1897) 68 Minn. 8 [70 N.W. 800] the court upheld a statute which expressly gave a deserted wife authority to prosecute or defend any action which could have been prosecuted or defended by her husband if present. The court ruled, "There may be a delegation of agency or authority created by law as well as the real act of the person." (68 Minn. at pp. 10-11 [70 N.W. at p. 801].) No such statute is involved here. In three other cases the statements of the court were dicta, and the court in effect found actual or ostensible authority. (See *Taylor* v. *United States Casualty Company* (1956) 229 S.C. 230, 241-242 [92 S.E.2d 647, 652]; *Freeman* v. *Navarre* (1955) 47 Wn.2d 760, 767 [289 P.2d 1015, 1019]; and *Kunz* v. *Lowden* (10th Cir. 1942) 124 F.2d 911, 914.) In four cases with similar dictum the court found no agency at all. (See *Green* v. *Hannon* (Tex.Civ.App.1963) 369 S.W.2d 853, 856; *Booth Fisheries Corp.* v. *Eardley* (Tex.Civ.App. 1950) 233 S.W.2d 872, 875-876; *Ellison* v. *Hunsinger* (1953) 237 N.C. 619, 628 [75 S.E.2d 884, 891]; and *Twin City Fire Ins. Co.* v. *Zupnik* (1929) 32 Ohio App. 138, 145 [29 Ohio L.R. 334, 167 N.E. 695, 697].)

meaning of "independent contractor" and "agent," advised the jury that the contract between the parties, reciting that the salesman was not to be deemed an employee of the broker, would be "prima facie evidence" and a "controlling factor" in the relationship, but that they could consider the actual working arrangement between the parties also (215 Cal.App.2d at pp. 199-203). Although a similar but more appropriate instruction had been offered by the claimant, the court, after examining the applicable provisions of the Real Estate Law (Bus. & Prof. Code, §§ 10131, 10132, 10137, 10151, 10160, 10177, subd. (b)) and existing precedent (see *Grand* v. *Griesinger* (1958) 160 Cal.App.2d 397, 404-406 [325 P.2d 475]), concluded as follows: "We are of the opinion, however, that it was error for the court to have given any instructions on the effect of the employment contract because Shugg was an agent of the respondent as a matter of law." (215 Cal.App.2d at p. 203.) It also stated, ". . . a salesman, insofar as his relationship with the broker who employs him is concerned, cannot be classed as an independent contractor. Accordingly, any contract which purports to change that relationship from that of agent to independent contractor is invalid as being contrary to the provisions of the Real Estate Law. (See Civ. Code, §§ 1608, 1667.)" (*Id.,* at p. 207.) Plaintiff urges that by analogy a contract cannot convert one who would be a permitted general manager of a licensee into a prohibited independent contractor, and that therefore the relationship of principal and agent must be imposed by law. The validity of this contention must be appraised in the light of the pertinent constitutional and statutory provisions.

Section 22 (effective Jan. 1, 1957) of article XX of the state Constitution authorizes the Legislature to provide for licensing the premises where alcoholic beverages may be bought, sold, served, consumed and otherwise disposed of, and for classifying the types of premises as designated in the Constitution.[5] Section 23300 of the

[5]The Constitution provides in pertinent part: "The State of California, subject to the internal revenue laws of the United States, shall have the exclusive right and power to license and regulate the manufacture, sale, purchase, possession and transportation of alcoholic beverages within the State. . . .

"All alcoholic beverages may be bought, sold, served, consumed and otherwise disposed of in premises which shall be licensed as provided by the Legislature. In providing for the licensing of premises, the Legislature may provide for the issuance of, among other licenses, licenses for the following types of premises where the alcoholic beverages may be sold and served for consumption upon the premises specified in the licenses may be sold and served for consumption upon the premises: [¶] (a) For bona fide public eating places, as defined by the Legislature. [¶] (b) For public premises in which food shall not be sold or served as in a bona fide public eating place, but upon which premises the Legislature may permit the sale or service of food products incidental to the sale and service of alcoholic beverages. No person under

Business and Professions Code provides that no person shall perform any act which a licensee may perform under the authority of a license, unless the person is authorized to do so by the license issued by the Department of Alcoholic Beverage Control. Section 23355 provides that the license issued by the department authorizes the person to whom issued to exercise the rights and privileges specified, and no others, at the premises for which issued.[6] (See *Martin* v. *Alcoholic Bev. etc. Appeals Bd.* (1959) 52 Cal.2d 287, 290 [341 P.2d 296]; *Greene* v. *Brooks* (1965) 235 Cal.App.2d 161, 167 [45 Cal.Rptr. 99]; *Du Pre* v. *Bogumill* (1959) 173 Cal.App.2d 406, 411 [343 P.2d 415]; and *Hooper* v. *Barranti* (1947) 81 Cal.App.2d 570, 575 [184 P.2d 688]. Note, *Teachout* v. *Bogy, supra,* 175 Cal. 481, 484-485.) Moreover, under the provisions of section 24040, with certain exceptions, inapplicable here, a license shall only be issued for a specific location.[7] (See *Greve* v. *Leger, Ltd.* (1966) 64 Cal.2d 853, 859 [52 Cal.Rptr. 9, 415 P.2d 824].) "Unlike the rule with respect to the right to deal in ordinary commodities . . . there is no inherent right in a citizen to sell intoxicants [citations], and a license to do so is not a proprietary right within the meaning of the due process clause of the Constitution

the age of 21 years shall be permitted to enter and remain in any such premises without lawful business therein. [¶] (c) For public premises for the sale and service of beers alone. ▮ (d) Under such conditions as the Legislature may impose, for railroad dining or club cars, passenger ships, common carriers by air, and bona fide clubs after such clubs have been lawfully operated for not less than one year. . . .

"The Legislature may authorize, subject to reasonable restrictions, the sale in retail stores of alcoholic beverages contained in the original packages, where such alcoholic beverages are not to be consumed on the premises where sold; and may provide for the issuance of all types of licenses necessary to carry on the activities referred to in the first paragraph of this section, including, but not limited to, licenses necessary for the manufacture, production, processing, importation, exportation, transportation, wholesaling, distribution, and sale of any and all kinds of alcoholic beverages."

[6]All references below are to applicable sections of the Business and Professions Code (Alcoholic Beverage Control Act [see § 23000]) unless otherwise noted.

Section 23300 reads: "No person shall exercise the privilege or perform any act which a licensee may exercise or perform under the authority of a license unless the person is authorized to do so by a license issued pursuant to this division."

Section 23355 provides: "Except as otherwise provided in this division and subject to the provisions of Section 22 of Article XX of the Constitution, the licenses provided for in Article 2 of this chapter authorize the person to whom issued to exercise the rights and privileges specified in this article and no others at the premises for which issued during the year for which issued. Deliveries of distilled spirits by a licensee to another licensee may be made from the vendor's licensed premises or from a warehouse located within the county in which the vendor's licensed premises are located except as permitted by Section 23383. Deliveries to a licensed importer may also be made from any point outside the State."

[7]Section 24040 provides in part: "Each license shall be issued to a specific person and, except in the case of licenses authorizing the sale of alcoholic beverages on trains or boats, or the service of alcoholic beverages on airplanes shall be issued for a specific location, the principal address of which shall be indicated on the license. . . ."

[citation], nor is it a contract [citation]; it is but a permit to do what would otherwise be unlawful, . . ." (*State Bd. of Equalization* v. *Superior Ct.* (1935) 5 Cal.App.2d 374, 377 [42 P.2d 1076]. See also *Saso* v. *Furtado* (1951) 104 Cal.App.2d 759, 763 [232 P.2d 583]; and *Irvine* v. *State Board of Equalization* (1940) 40 Cal.App.2d 280, 284 [104 P.2d 847].)

At all times material section 24070 provided and now provides, in part: "Each license is separate and distinct and is transferable upon approval by the department from the licensee to another person and from one premises to another premises . . . ." Since October 1, 1949, however, the Alcoholic Beverage Control Act has contained provisions which limit the right of a licensee to "enter into any agreement wherein he pledges the transfer of his license as security for a loan or as security for the fulfillment of any agreement." (See Stats. 1949, ch. 1348, § 4.5, p. 2360, adding § 7.3 to the act.)[8] Moreover, since 1941 the act has contained provisions which require recording of a notice of an intended transfer and the deposit of the consideration for the transfer in escrow in connection with the transfer of most licenses. (See Stats. 1941, ch. 1189, § 1, p. 2960, adding § 7.2 to the act.)[9]

In *Teachout* v. *Bogy, supra,* 175 Cal. 481, this court reversed a judgment obtained by the seller of licensed premises against the defaulting purchaser, because the contract, which contemplated that the

---

[8]Since November 8, 1967, section 24076 has provided as follows: "No licensee shall enter into any agreement wherein he pledges the transfer of his license as security for a loan or as security for the fulfillment of any agreement. No license shall be transferred if the transfer is to satisfy a loan or to fulfill an agreement entered into more than 90 days preceding the date on which the transfer application is filed, or to gain or establish a preference to or for any creditor of the transferor, *except as provided by Section 24074,* or to defraud or injure any creditor of the transferor." (Stats. 1967, ch. 753, § 2, p. 2119, italics added to show language added in 1967.) The unemphasized language was enacted in 1963 (Stats 1963, ch. 295, § 1, p. 1064), and the prior law contained language of similar import.

[9]These provisions are now found in sections 24073 and 24074. Insofar as is material here the latter section substantially provided and now provides, as follows: "Before the filing of such a transfer application with the department, if the intended transfer of the business or license involves a purchase price or consideration, the licensee and the intended transferee shall establish an escrow with some . . . holder, and the intended transferee shall deposit with the escrow holder the full amount of the purchase price or consideration . . . . The licensee and intended transferee shall also enter into an agreement, which agreement shall be deposited with the escrow holder, directing the escrow holder, . . . to pay out of the purchase price or consideration, the claims of the bona fide creditors of the licensee who file their claims with the escrow holder before the escrow holder is notified by the department of its approval of the transfer of the license or if the purchase price or consideration is not sufficient to pay the claims in full, to distribute the consideration [among the creditors of the licensee as provided in the statute] . . . ." (See Stats. 1959, ch. 524, § 1, p. 2491, as amended through Stats. 1972, ch. 1000, § 1, p. 1826.)

unlicensed purchaser would operate the premises under the seller's license while it was held in escrow, was illegal under a city ordinance which prohibited anyone from engaging in the business of selling liquor unless licensed to do so (175 Cal. at pp. 484-487). The opinion states: "... the fact that the business could have been carried on under a new license for which no provision was made in the contract and which would have prevented the effect intended by one of its provisions, does not make the contract valid." (*Id.,* p. 488. Cf. *Du Pre* v. *Bogumill, supra,* 173 Cal.App.2d 406, 413; *Saso* v. *Furtado, supra,* 104 Cal.App.2d 759, 769; *Fong* v. *Rossi* (1948) 87 Cal.App.2d 20, 22-23 [195 P.2d 854]; and *Grace* v. *Croninger* (1922) 56 Cal.App. 659, 663 [206 P. 130].)

Similarly in *Hooper* v. *Barranti, supra,* the court reversed a judgment, which had granted the assignee of a contractual partner, who was an alien and ineligible for a license, a half interest in the assets, other than the license, in the name of the other partner, because the agreement was illegal. The court noted, "It [the agreement] contemplated (and the parties pursuant to it executed that contemplation) the conducting by a partnership of an on-sale retail liquor business at least for a period of 15 months without a license therefor. The license held by Hooper was issued to him as an individual and did not license him as a partner, nor the partnership, to conduct the business. Section 7 of the Alcoholic Beverage Control Act provides that each license shall be issued to a specific person, and in section 2 of the act the term 'person' is defined to include a copartnership. Section 10 requires that in the case of a partnership the application for license must be signed by each of the partners." (81 Cal.App.2d 570, 575. See also *Martin* v. *Alcoholic Bev. etc. Appeals Bd., supra,* 52 Cal.2d 287, 291-292.)

The agreement between the partners and the concessionaires provided, "9. Application has been made 'for an on-sale general bona fide eating place liquor license and application fees totaling $6,340.00 have been paid. The license remains the exclusive property of the General Partners of the Limited Partnership and you agree to advance as a deposit, to remain on deposit throughout your term as concessionaires, the sum of $6,340.00 which shall be forfeited in the event of your failure to perform any material condition of your agreement, or which shall be refunded to you in the event all of the conditions of the agreement have been performed by you and you elect not to continue with the term of the agreement." ■ Since the agreement on its face required the concessionaires to operate the restaurant and bar without having a license in the name of the concessionaires, and since the business was in

fact operated in that manner, the Department of Alcoholic Beverage Control properly filed the charges against the licensees which were ultimately disposed of by their admission of guilt and payment of a fine. Those proceedings did not establish any relationship of principal and agent between the partners and the concessionaire. The accusation, which was admitted, read: "Since on or about October 11, 1966, up to the date of filing this accusation, respondent-licensees have not been and are not now the true owners of the business operated at the licensed premises, but in truth and in fact, Joseph Padovan and Paul Abowd have been and are now the owners or part owners of said business and exercising the privileges of a license without being so licensed by the Department of Alcoholic Beverage Control."

Nevertheless the assignee insists that under the circumstances an agency should be created by operation of law. It relies upon the general rule expressed in *Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1961) 197 Cal.App.2d 172 [17 Cal.Rptr. 315], as follows: "The licensee had the responsibility to see to it that the license was not used in violation of law." (197 Cal.App.2d at p. 181.) It asserts that unless the licensees are held liable to the creditors it will violate maxims in the Civil Code which provide, "No one can take advantage of his own wrong" (Civ. Code, § 3517), and "No one should suffer by the act of another." (*Id.*, § 3520.) More specifically, in relation to the liquor wholesalers, it relies upon those sections of the Alcoholic Beverage Control Act which protect the creditors of a licensee in the event of a transfer of the license. (See fn. 9 above.) In *Grover Escrow Corp.* v. *Gole* (1969) 71 Cal.2d 61 [77 Cal.Rptr. 21, 453 P.2d 461], this court observed with respect to the sections controlling transfers of licenses "Business and Professions Code sections 24070 through 24082 provide a comprehensive program to regulate liquor license transfers, giving unmistakable indication of the Legislature's determination to exercise its power to control every phase of such transfers. [Citation.] Section 24074 was intended to protect not only buyers and sellers of liquor licenses, but also the creditors of sellers, by creating a payment plan dependent upon submission of claims, and not upon the usual commercial self-help procedures of attachment and execution. [Citation.] This is consistent with other aspects of the overall transfer scheme, particularly section 24076, which precludes the use of liquor licenses *or their transfer* as security devices. [Citations.]" (71 Cal.2d at p. 64. See also *Harriman* v. *Tetik* (1961) 56 Cal.2d 805, 812 [17 Cal.Rptr. 134, 366 P.2d 486]; and *Doyle* v. *Caughlin* (1974) 37 Cal.App.3d 911, 916-918 [112 Cal.Rptr. 701].) The provisioners, it is

asserted, are entitled to the same consideration because the license itself required that the premises be operated as a bona fide eating place.

The Legislature has provided for various categories of licenses and licensed premises. So far as is pertinent here section 23378 provides: "Any wholesaler's license authorizes the sale of the alcoholic beverage specified in the license only to persons holding licenses issued by the department authorizing the sale of the alcoholic beverage, . . ."

Although the number of premises for which an on-sale general license may be issued is limited in proportion to the population (see § 23816), section 23824 authorizes the issuance of a license without such limitation for premises operated as a bona fide public eating place on specified public property.[10] General provisions concerning the issuance of an on-sale license for the sale of alcoholic beverages to be consumed or otherwise disposed of in any bona fide public eating place are found in sections 23038 and 23787. The former section defines a bona fide public eating place. Admittedly "Padovan's on the Green" was such a place. The latter section, until amended in 1971, appeared to preclude the subletting of the sale and service of meals except in certain designated premises not applicable here.[11]

---

[10]At the time, December 9, 1966, the license was issued in this case, section 23824 read as follows: "Limitations provided by Section 23816 on the number of licensed premises shall not apply to premises owned by the State of California, any incorporated city, county, city and county, airport district, or other district or public corporation of the State of California and operated as a bona fide public eating place. [¶] Licenses issued on premises owned by the State, incorporated city, county, city and county, airport district, or other district or public corporation of the State of California, shall be renewable as set forth in Sections 24048.1 or 24048.3. Such licenses shall be excluded from the number of premises used in determining application of the limitations provided by this article. Such licenses shall be subject to the provisions of Section 23954.5 and shall be only transferable from person to person at the same premises. Prior to the issuance of such licenses, the governmental agency owning such premises shall file with the department a written request that the license be issued and a written statement setting forth the reasons why issuance of the license would be in the public interest." (Stats. 1961, ch. 533, § 1, p. 1635.)

The section was amended the following year to include "premises leased to any county" in the types of public property specified. (Stats. 1967, ch. 809, § 1, p. 2330.)

[11]At the time the license was issued in this case the first paragraph of section 23787 read as follows: "The department shall, before issuing any on-sale license for the sale of alcoholic beverages, other than beers, to be consumed or otherwise disposed of in any bona fide public eating place, determine whether the public eating place is equipped and maintained in good faith for sales to and consumption by the public of meals upon the premises. A hotel or motel of 75 rooms or more which is licensed and so equipped and maintained may sublet the sale and service of the meals required by Section 23038. Provided, however, that the licensee shall be responsible for any violations of this

When the right to sell and dispose of liquor for consumption on the premises is limited to a bona fide public eating place, the failure of the licensee to operate the restaurant, which was completely sublet to another to operate as an exclusive concession without any control or supervision by the licensee, was a ground for suspension of the licensee's license. (*Harem Corp.* v. *State Bd. of Equalization* (1948) 87 Cal.App.2d 915, 919-920 [198 P.2d 48]. See also *Farmer Brothers Co.* v. *Kiernan* (1957) 149 Cal.App.2d 867, 868 [309 P.2d 69]; *Luce* v. *Sutton* (1953) 115 Cal.App.2d 428, 432 [252 P.2d 352]; and 29 Ops.Cal.Atty.Gen. 95, Opn. No. 57-25 (1957). Cf. fns. 10 and 11 above.) It is contended that the suppliers of provisions to the restaurant should be protected in the same manner as the wholesalers who furnished alcoholic beverages, because under the type of license issued the bar could not have been operated without the restaurant. The validity of this view is not only dependent on the validity of the contention that the illegal use of the license gave rise to an obligation on the part of the partnership, but it is handicapped by the fact that there is no illegality in selling provisions to a restaurant enterprise which is dispensing alcoholic beverages without a proper license.

In *Weichman* v. *Vetri* (1950) 100 Cal.App.2d 177 [223 P.2d 288], the court upheld a summary judgment for the licensee in an action in which a creditor sought to recover amounts due for the purchase price and repairs to machinery furnished the owner of the premises who operated the restaurant on the premises covered by the license. The court observed, "Respondent asks us to indulge the fantastic presumption that Vetri and Cox were partners, because, says respondent, a bar cannot be conducted except 'in connection with a restaurant or other place to dispense food' and by operation of law such a place of business is an entity . . . . if there be any statute, rule or regulation requiring that the seller of intoxicating liquors must own the hotel or cafe in which they are sold, a question we are not called upon to determine, then had Cox been operating in violation thereof his act would be one for the attention of the Board of Equalization of the state or of other law enforcement

---

division caused or permitted by the lessee on the licensed premises . . . ." (Stats. 1961, ch. 1686, § 1, p. 3659.)

In 1967 and 1968 amendments were made which deleted the words "other than beers" and extended the subletting of the sale and service of meals privilege to certain bowling centers. (Stats. 1967, ch. 1189, § 2, p. 2901; Stats. 1967, ch. 1296, § 4, p. 3105; and Stats. 1968, ch. 1196, § 1, p. 2272.) In 1971 the privilege was extended to all bona fide public eating places, and it was required that the sublessees should have the qualifications of a holder of a license. (Stats. 1971, ch. 1184, § 1, p. 2256.)

officers but would not be the basis of a presumption that he was in partnership with the owner of the premises." (100 Cal.App.2d at p. 180. See also *Reynolds* v. *State Board of Equalization* (1946) 29 Cal.2d 137, 140 [173 P.2d 551, 174 P.2d 4]; and *Weichman* v. *Vetri* (1952) 113 Cal.App.2d 717, 719 [248 P.2d 783].)

The effect of Padovan's use of the license, if known and relied upon by any of the group of creditors furnishing provisions must be evaluated in the light of general principles of agency. (See *Farmers Brothers Co.* v. *Kiernan, supra,* 149 Cal.App.2d 867, 868-890; *Wahyou* v. *Kiernan* (1956) 145 Cal.App.2d 443, 445 [302 P.2d 638], and part IV below.) The liquor wholesalers, however, insist that they "sell to the license," and that the illegality of the arrangement between the licensees and the concessionaire should not defeat their right to recover from the licensees. Whether each did in fact "sell to the license" is reviewed below (see part IV). There is no specific statutory requirement that the licensees be responsible for the concessionaire's debt to any wholesaler who blindly extended credit to the concessionaire without investigating his right to use the license. As noted above, the provisions of sections 24073 and 24074 (fn. 9 above) evince a legislative intent to protect creditors of the licensee. It also has been recognized that the department responsible for the administration of the liquor laws "is well within its rights to require a high standard of economic stability for those who are to hold wholesalers licenses. [Citation.]" (*Duke Molner etc. Liquor Co.* v. *Martin* (1960) 180 Cal.App.2d 873, 884 [4 Cal.Rptr. 904].) Nevertheless, that decision, after reviewing the purpose of the Alcoholic Beverage Control Act (see § 23001), opined: "The 'economic' welfare which will be achieved by strict regulation and curtailment of the use of liquor and the economic benefits resulting to the people from the promotion of temperance, rather than those resulting from the promotion of the liquor industry is the welfare which is meant by such section. [Citation.]" (*Id.,* at p. 880.)

■ The public interest does not strike down all rights and obligation between a licensee and one whom he has improperly permitted to use the license. The failure to disclose in the applications for renewal licenses that a partnership in fact operated an on-sale liquor business under an individual license is grounds for disciplining the individual license holder. (*Martin* v. *Alcoholic Bev. etc. Appeals Bd., supra,* 52 Cal.2d 287, 291.) In upholding the penalty of revocation, it was noted: "The Department is charged with the responsibility of supervising the operation of liquor establishments and those who would exercise the

privileges of liquor licenses. Undoubtedly, it has encountered serious problems in attempting to prevent the operation of such establishments by undisclosed partners or owners." (*Id.,* p. 293. See also *Hooper* v. *Barranti* (1947) 81 Cal.App.2d 570, 575 [184 P.2d 688].) Nevertheless in *Greene* v. *Brooks* (1965) 235 Cal.App.2d 161 [45 Cal.Rptr. 99], the court concluded: "The licensing statutes, such as the Alcoholic Beverage Control Act, are passed primarily for the protection and safety of the public and not for the benefit of a guilty partner who seeks to keep all of the fruits of a partnership enterprise for himself. Where the illegal transaction has been terminated, public policy is not protected or served by denying one partner relief against the other [citation]." (*Id.,* at p. 169. See also *Du Pre* v. *Bogumill, supra,* 173 Cal.App.2d 406, 412-414.)

Nor does the public interest require that all arrangements for the transfer of a license be branded as illegal. In *Greve* v. *Leger, Ltd., supra,* this court reviewed the effect of the provisions now found in section 24076, upon an agreement for the sale of licensed premises which gave the seller the option to repurchase the liquor license in the event the purchaser defaulted in its payments. The opinion recognizes, "Ordinarily, holders of alcoholic beverage licenses may freely contract to transfer those licenses to other persons, subject, of course, to official approval of the transfer. Such contracts are valid and specifically enforcible. (Bus. & Prof. Code, § 24070; *Bell'Isle* v. *Hempy* (1962) 206 Cal.App.2d 14, 16 . . .; *Golden* v. *State of California* (1955) 133 Cal.App.2d 640, 644 . . .; *Saso* v. *Furtado* (1951) 104 Cal.App.2d 759, 769-770 . . . .)" (64 Cal.2d at p. 857.) The majority observed that "the lessor of premises licensed for the sale of alcoholic beverages who retains an option to repurchase the license from the lessee at the termination of the lease may be said to have preserved the option 'as security' since the option 'secures' or preserves the value of the lessor's remainder interest in the premises." (*Id.,* p. 858.) Decisions which had outlawed such agreements were reviewed. (See *Hammond* v. *Pasquini* (1963) 211 Cal.App.2d 540, 542-545 [27 Cal.Rptr. 208]; *Bell'Isle* v. *Hempy* (1962) 206 Cal.App.2d 14, 17 [23 Cal.Rptr. 599]; *Elmquist* v. *Lock* (1961) 194 Cal.App.2d 372, 376-378 [15 Cal.Rptr. 447]; and *Citrigno* v. *Williams* (9th Cir. 1958) 255 F.2d 675, 678-679. Cf. *Holt* v. *Morgan* (1954) 128 Cal.App.2d 113, 116-117 [274 P.2d 915].) The opinion concludes, "Examination of the rationale underlying these decisions discloses a misunderstanding of the purpose of section 24076. . . . Apparently the court erroneously assumed that performance by the purchaser of his undertaking 'to have his name removed from the license' in the event of his default would automatically effect a transfer of the license without official approval. Yet all licenses are issued only to

specific individuals for use at specific locations (Bus. & Prof. Code, § 24040), and all transfers are subject to official investigation and approval in the same manner as the initial issuance of a license. (Bus. & Prof. Code, §§ 24070, 23958, 23987, 23988.) Indeed, the omission of a provision for such approval in the private agreement of the parties does not affect the need for official sanction.

"The requirement for such approval is an implied condition of all agreements for the transfer of alcoholic beverage licenses, whatever the context and whatever the nature of the consideration. (*Golden* v. *State of California, supra,* 133 Cal.App.2d 640, 644; *Saso* v. *Furtado, supra,* 104 Cal.App.2d 759, 765-769; *Campbell* v. *Bauer* (1951) 104 Cal.App.2d 740, 744 . . .; *Leboire* v. *Black* (1948) 84 Cal.App.2d 260, 262 . . . .)

"In light of our conclusion that the cited cases have incorrectly divined the purpose of section 24076 we cannot adopt the expansive reading which they have given that statute in response to their mistaken concept of its objective. Surely we should not ascribe to the Legislature an intent to outlaw all agreements for the transfer of licenses which serve to assure the value of some *other* asset or protect the integrity of some *other* agreement." (*Id.,* pp. 858-860. See also *Cavalli* v. *Macaire* (1958) 159 Cal.App.2d 714, 718-720 [324 P.2d 336]; *Etchart* v. *Pyles* (1951) 106 Cal.App.2d 549, 551-552 [235 P.2d 427]; and *Fong* v. *Rossi* (1948) 87 Cal.App.2d 20, 22-23 [195 P.2d 854].)

In the same case the provisions which read, "No license shall be transferred if the transfer is . . . to fulfill an agreement entered into more than 90 days preceding the date on which the transfer application is filed . . ." were construed as similar provisions had been in *Harriman* v. *Tetik* (1961) 56 Cal.2d 805 [17 Cal.Rptr. 134, 366 P.2d 486], i.e., "That provision, the court concluded, was not intended to render nonconforming agreements illegal, but only to prevent the transfer of licenses in satisfaction of such agreements." (*Id.,* at p. 862; and see 56 Cal.2d at pp. 811-812.) The opinion recites, "Accordingly, we conclude that the 90-day provision of section 24076, although it undoubtedly precludes specific enforcement of the option agreement, does not render that agreement illegal and hence affords no defense to an action for damages." (64 Cal.2d at p. 862.)

It may also be noted that in the past a managerial status has been authorized pending a transfer. (See *Associated Creditors' Agency* v. *Haley*

*Land Co.* (1966) 239 Cal.App.2d 610, 614-615 [49 Cal.Rptr. 1]; and *Du Pre* v. *Bogumill, supra,* 173 Cal.App.2d 406, 412-413.)[12] At all times the law provided, "No onsale licensee shall knowingly employ any person to manage, direct, or conduct the business who does not have the qualifications required of a holder of the license." (§ 23788.5.) The report dated November 17, 1966, on the partners' application for the license indicates that the department had the contract before it, and that the concessionaires had been requested to fill out appropriate forms and be fingerprinted. It may be inferred that they did so before the license was issued. It, therefore, appears that the public interest in the integrity of those actually operating under the license was satisfied.

Any liquor wholesaler who chose to deal with Padovan and extend credit to his enterprise without inquiry as to the relations between the licensee and the operation may be branded as contributing to the operation which was ultimately adjudged illegal. It is unnecessary to determine whether such illegality would preclude all recovery by the liquor wholesalers, or whether they would have rights against Padovan.

---

[12]At one time subdivisions (d) and (e) of the regulations (Cal.Admin. Code, tit. 4, § 60) dealing with the transfer of licenses provided: "(d) The transferee shall not exercise any of the privileges of a licensee until the license is transferred by the issuance of a license certificate to the transferee. The transferor shall not permit the transferee to exercise any of the privileges of a licensee until the license is transferred. Transfer of title to the licensed business shall coincide with the transfer of the license. [¶] (e) During the period when the application for transfer is pending before the department, the transferor or any person who may execute a transfer application pursuant to subsections (f) through (h) of this rule, may enter into a written contract with the transferee pursuant to which the transferee may operate the licensed business as the agent of the transferor. Upon the approval of such written contract by the department, the transferee may operate the licensed business as the agent of the transferor pending notice of final decision by the department on his application for a license." (Cal. Admin. Code, Register 60, No. 14, filed June 9, 1960, effective thirtieth day thereafter. Repeal filed, Register 65, No. 18, Sept. 24, 1965, effective thirtieth day thereafter.)

At the time the license was issued the subdivisions provided: "(d) In the absence of a temporary license, the transferee shall not exercise any of the privileges of a licensee until the license is transferred by the issuance of a license certificate to the transferee. The transferor shall not permit the transferee to exercise any of the privileges of a license until the license is transferred. [¶] (e) A temporary retail license of the same type may, in the discretion of the department, be issued to the applicant for a person-to-person transfer upon meeting all the conditions specified in Section 24045.5 of the Alcoholic Beverage Control Act. [¶] If a temporary license is issued to the applicant for the transfer of an on-sale general license on which a caterer's permit has been issued, the temporary licensee shall be entitled to exercise all the privileges of a caterer's permit during the period in which the temporary license remains in effect without the payment of an additional fee." (*Id.,* Register 65, No. 23, filed and effective as an emergency Nov. 24, 1965.)

Subsequently subdivision (e) was amended to read as found today. (*Id.,* Register 67, No. 46, filed Nov. 16, 1967, effective thirtieth day thereafter.)

(See *Stockton Morris etc. Co.* v. *Calif. etc. Corp.* (1952) 112 Cal.App.2d 684, 689-691 [247 P.2d 90]; and cf. *Nevcal Enterprises* v. *Cal-Neva Lodge, Inc.* (1963) 217 Cal.App.2d 799, 806-807 [32 Cal.Rptr. 106]; *Higgins* v. *Standard Fed. Sav. & Loan Assn.* (1961) 188 Cal.App.2d 68, 75 [10 Cal.Rptr. 200]; and *Norwood* v. *Judd* (1949) 93 Cal.App.2d 276, 288-289 [209 P.2d 24].) ▉ It is concluded that since the wholesalers are charged with the duty of selling only to licensees, public policy should not permit them to blindly sell to any person operating a licensed premises, and unqualifiedly be granted a recovery as a matter of law from the licensee. If public policy requires that the licensee actually operate the licensed premises, that policy will be better served by enlisting the aid of the wholesalers to insure that no liquors will be furnished unlicensed operators. Any recovery in this case cannot be predicated on agency as a matter of law, which is not created by the statutes and precedents which have been reviewed. It must rest on general principles of agency.

## IV

The trial court concluded, "There was no 'apparent' nor 'ostensible' authority under which said Defendants were the principals and Padovan the agent for them in the operation of the bar and restaurant known as 'Padovan's on the Green'." The findings of fact which have recitals bearing on that issue are set forth in the margin.[13] Insofar as the findings

---

[13]"1. The defendants . . . were the named licensees on a general on-sale liquor license for a public eating place, issued for the premises which they owned, and such license was displayed on the premises. At all times relevant to this proceeding, the bar and restaurant at such premises was operated entirely by one Padovan, under the trade name of 'Padovan's on the Green', pursuant to an agreement between Padovan and Defendants pursuant to which Padovan was an independent operator conducting his own business. At no time was Padovan in fact or purportedly or apparently the agent of Defendants; rather, he was a tenant carrying on his own business in his own name. The arrangement by which Defendants purported to 'sub-license' the liquor license to Padovan was known to the state regulatory authorities during the period pertinent to this case.

"2. The creditors represented by the Plaintiff (hereinafter the 'Creditors') at no time material to this lawsuit, had any direct dealings with Defendants and said Defendants made no statements or engaged in any conduct which directly or by implication, represented to Creditors that said Defendants were conducting the operations of the bar and restaurant or guaranteeing payment of the bills.

" . . . . . . . . . . . . . . . . . .

"4. Creditors dealt with Padovan as the party to whom they were extending credit, and continued to make sales to him even after he became delinquent in his accounts, without making any inquiry of Defendants as to their responsibility or any notice to Defendants that they considered Defendants responsible.

"5. Said Defendants made no representations in the way of statements or conduct, directed to Creditors (or to Plaintiff as Creditors' representative) by which Creditors or

of fact incorporate legal conclusions concerning the status of the defendants they must stand or fall as they are supported by specific facts which were found to be true and by the evidence before the court. The assignee's attack on the judgment must embrace of necessity an attack on such findings of fact as negate the existence of circumstances necessary to establish ostensible agency.

The Civil Code recognizes that agency, and the authority conferred upon an agent, may be ostensible as well as actual (§§ 2298 and 2315). "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." (§ 2300.) "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." (§ 2317.) "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof." (§ 2334.) ■ "It is elementary that there are three requirements necessary before recovery may be had against a principal for the act of an ostensible agent. The person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; such belief must be generated by some act or neglect of the principal sought to be charged; and the third person in relying on the agent's apparent authority must not be guilty of negligence. [Citation.]"

---

Plaintiff could reasonably have believed that said Defendants were operating the bar and restaurant or that Padovan, as the operator thereof, was the agent of said Defendants.

"6. Padovan did not have either actual or apparent authority from Defendants to buy liquor or food from Creditors for the account of Defendants.

"7. The Creditors' belief that Defendants were the principals in the operation was based solely on the assumption as a matter of course that the business was being conducted by the people to whom the license had been issued, and not on any inquiry of Defendants or any representation by them.

"8. Defendants and Padovan believed in good faith that the 'sub-license' arrangement between them was valid and had the legal effect of making an independent operator of Padovan in the Bar and Restaurant operation, and that operation was in fact conducted by Padovan as his sole and independent business. No advice as to the illegality of such arrangement was communicated to Defendants or Padovan by the state regulatory authorities during the period involved in this case.

"9. All sales and advancing of credit by Creditors to Padovan was carried out under circumstances either of actual or constructive knowledge by Creditors that Padovan was not the licensee of the on-sale premises.

"10. Creditors chose to deal with Padovan, to extend credit to him, and to look to him for payment during the course of the relationship of creditor and debtor and not to deal with said Defendants nor to look to said Defendants for payment during such period, even though creditors knew that Defendants were the named owners of the on-sale liquor license for the premises."

(*Hill* v. *Citizens Nat. Trust & Sav. Bk.* (1937) 9 Cal.2d 172, 176 [69 P.2d 853]. See also *Burr* v. *Capital Reserve Corp.* (1969) 71 Cal.2d 983, 986 [80 Cal.Rptr. 345, 458 P.2d 185]; *Tomerlin* v. *Canadian Indemnity Co., supra,* 61 Cal.2d 638, 643; *Gosliner* v. *Grangers' Bank of Cal.* (1899) 124 Cal. 225, 227 [56 P. 1029]; *Donnelly* v. *S.F. Bridge Co.* (1897) 117 Cal. 417, 421 [49 P. 559]; *Yanchor* v. *Kagan, supra,* 22 Cal.App.3d 544, 549; *Hartong* v. *Partake, Inc., supra,* 266 Cal.App.2d 942, 960; *Curtis* v. *Hannaford & Talbot* (1965) 236 Cal.App.2d 182, 184-185 [45 Cal.Rptr. 785]; *United States Credit Bureau, Inc.* v. *Cheney, supra,* 235 Cal.App.2d 357, 360; *Credit Bureau of San Diego* v. *Beach, supra,* 144 Cal.App.2d 439, 444; *Freitas* v. *Marsh, supra,* 70 Cal.App.2d 711, 713-714; *Traders C. Corp, Ltd.* v. *Radin & Kamp, Inc., supra,* 131 Cal.App. 479, 480; *McMurry* v. *Pacific Ready-Cut Homes, Inc.* (1931) 111 Cal.App. 341, 343-344 [295 P. 542]; *Barton* v. *Studebaker Corp. of America, supra,* 46 Cal.App. 707, 721-725; and *Raftis* v. *McCloud River Lumber Co., supra,* 35 Cal.App. 397, 401-403.)

 The findings are conflicting as to whether or not the partnership can be charged with some act or neglect which could give rise to the belief that the concessionaire was acting as their agent. (Cf. *Hill* v. *Citizens Nat. Trust & Sav. Bk., supra,* 9 Cal.2d 172, 176; *Credit Bureau of San Diego* v. *Beach, supra,* 144 Cal.App.2d 439, 444; *Traders C. Corp, Ltd.* v. *Radin & Kamp, Inc., supra,* 131 Cal.App. 479, 481; and *McMurry* v. *Pacific Ready-Cut Homes, Inc., supra,* 111 Cal.App. 341, 345-346.) In finding "2" (see fn. 13 above), it is unequivocally stated that the "Defendants made no statements or [*sic* 'nor'] engaged in any conduct which directly or by implication represented to Creditors that said Defendants were conducting the operations of the bar and restaurant or guaranteeing payment of the bills." Finding "5" *(id.)* is of the same purport. It, however, permits the inference that the defendants may have made representations in the way of statements or conduct, but that the creditors could not have reasonably believed that such statements or conduct indicated that the defendants were operating the bar and restaurant or that the concessionaire was their agent. Finding "6" *(id.)* is at best a mixed finding of ultimate fact and conclusion of law. On the other hand, the court expressly found *(id.,* finding "1") that defendants were the named licensees on the liquor license and the owners of the premises, and that they permitted the license to be displayed on the premises. Such posting is required by law. (Bus. & Prof. Code, § 24046. See *Elmquist* v. *Lock* (1961) 194 Cal.App.2d 372, 376 [15 Cal.Rptr. 447].) The latter facts are not questioned.

The partners nevertheless contend that their permitting the concessionaire to use and display the license could not be a representation that the concessionaire was their agent because investigation would reveal the agreement under which the concessionaires undertook complete fiscal responsibility for the operation of the premises as independent contractors. "When the conduct of the principal warrants further inquiry or when the third party is dealing with an assumed agent, the third party is bound at his peril, if he would hold the principal liable, to ascertain not only the fact of the agency but the nature and extent of the authority. [Citations.]" (*United States Credit Bureau, Inc.* v. *Cheney, supra,* 235 Cal.App.2d 357, 361. See also *Hill* v. *Citizens Nat. Trust & Sav. Bk., supra,* 9 Cal.2d 172, 176-177.) The finding that the regulatory authorities were advised of the arrangement between the partners and the concessionaires (fn. 13 above, finding "1") is sustained by evidence that between September 28, 1966, when the application for the license was filed and December 9, 1966, when it was issued, a copy of the agreement was deposited with the department. The further finding that the concessionaire and the partners believed in good faith that the arrangement was valid and had the legal effect of making the concessionaire an independent contractor (*id.,* finding "8")· is sustained by some of the testimony. The further finding that no advice as to the illegality of such arrangement was communicated to the partners or the concessionaire during the period involved (*id.)* is not sustained. The uncontradicted evidence reflects that as a result of an intradepartmental inquiry initiated December 20, 1966, after the license was issued, a representative of the department, as early as the first week in January 1967, expressed an opinion that the arrangement was improper. A representative of the partnership was so advised on May 5, 1967, if not before. There is a dispute as to whether the department's representative was to recommend a solution or whether the partners were unconditionally advised to take steps to rectify the situation. In any event nothing was done until an investigation was made in February 1968. That investigation resulted in the filing of an accusation on March 6, 1968. The accusation was disposed of by a settlement in 1969, under which the partners admitted the charged violation and paid a fine. The foregoing evidence indicated that there was no actual agency. It only bears on the question of ostensible agency in that it reflects that if any wholesaler had made intensive inquiry concerning who was responsible for the operation of "Padovan's on the Green," it would have found that the agreement existed. If as contended by the department's representative, the department then considered the arrangement illegal, the supplier could have refused delivery until the licensees assumed responsibility, or take the

risk that he was supplying a concessionaire operating without a license. On the other hand, if as contended by the partners the department had not finally condemned the arrangement, the supplier, by continuing deliveries, would elect to look to the credit of the independent concessionaire. In either event, according to the partners, the wholesaler would not be entitled to consider the use of the license as a representation that the concessionaire was the agent of the partners.

The foregoing analysis fails to give full weight to the principles reviewed above. Although this court is not prepared to impose absolute liability on the licensee who permits his license to be used by another, the fact that the license is so used is one factor to be considered in determining whether there was an ostensible agency. There is a maxim, "The law has been obeyed." (Civ. Code, § 3548.) It also may be applied to protect third persons who deal with another person in reliance upon what appears to be a legal relationship between him and a second person. (See *Gipson* v. *Davis Realty Co., supra,* 215 Cal.App.2d 190, 206-207; *Higgins* v. *Standard Fed. Sav. & Loan Assn., supra,* 188 Cal.App.2d 68, 75; *Farmer Brothers Co.* v. *Kiernan, supra,* 149 Cal.App.2d 867, 868; *Alford* v. *Bello* (1955) 130 Cal.App.2d 291, 294 [278 P.2d 962]; and *Luce* v. *Sutton, supra,* 115 Cal.App.2d 428, 432.) In *Alford* v. *Bello, supra,* the court applied the former presumption as follows: "It is presumed that a person is innocent of crime or wrong and that the law has been obeyed. [Citation.] The presumptions are evidence and if not controverted the trier of fact is bound to find in accordance with them. [Citation.] Bello was transporting property of others for compensation over a public highway by means of a motor vehicle at the time of the accident. The arrangements between Conrotto and Bello were entirely oral. It is presumed that in transporting the property he was innocent of crime and was obeying the law. The presumptions are evidence that he was not acting as an independent contractor since if he were acting as such he would be guilty of a crime. It must then be inferred that he was Conrotto's employee. No status other than that of employer-employee could have been found under the evidence without disregarding or rebutting the presumption of Bello's innocence of crime and obedience of the law. There is no question but that if Bello was Conrotto's employee he was acting within the course of his employment at the time of the accident. The inference that he was Conrotto's employee was enough to compel denial of the motion for judgment of nonsuit." (130 Cal.App.2d at pp. 294-295.)

So here any creditor was entitled to rely on the appearances created by

the use of the license and assume that rather than the illegal relationship established by the agreement, there was a relationship of licensee and manager. (See *Associated Creditors' Agency* v. *Haley Land Co., supra,* 239 Cal.App.2d 610, 614-615.)[14] The question remains whether any of the creditors did in fact so rely.

The findings that the creditors dealt with the concessionaire as the party to whom they were extending credit with actual or constructive knowledge that he was not the licensee of the on-sale premises (see fn. 13, findings 4, 9 and 10) not only forecloses action against the partners as the undisclosed principal of their concessionaire (see part II above), but also appears to preclude the reliance necessary for the estoppel which is an element of ostensible agency. That part of finding "4" which recites that creditors continued to make sales to the concessionaire after he became delinquent in his accounts attains significance in the light of the provisions of the Alcoholic Beverage Control Act which prohibit a wholesaler from extending more than 30 days credit to a retailer, and which require the former to charge 1 percent interest every 30 days on accounts which are delinquent over 42 days from date of delivery. (§ 25509, added by Stats. 1963, ch. 1891, § 1, p. 3881.) Although the assignee asserts that there was no reason to contact the licensees directly if notice was given to their ostensible agent, the court was free to draw a contrary inference with respect to those accounts which were carried in the name of the concessionaire. In *Gosliner* v. *Grangers' Bank of Cal., supra,* this court observed, "The fact that plaintiff, knowing the relations that existed between the Reeds and the bank, yet charged the goods to the Reeds and not to the bank, is strong evidence tending to show that plaintiff did not believe that the Reeds were purchasing these goods as

---

[14]At all times material here section 23788.5 of the Alcoholic Beverage Control Act provided, and now provides: "No onsale licensee shall knowingly employ any person to manage, direct, or conduct the business who does not have the qualifications required of a holder of the license."

Section 57.5 of the applicable rules read and reads: "*Manager Defined.* A person to whom a licensee has delegated discretionary powers to organize, direct, carry on or control the operations of a licensed business shall be deemed the manager thereof for purposes of applying Section 23788.5 of the Alcoholic Beverage Control Act. Authority to control one or more of the following functions shall be prima facie evidence that such a person is the manager of the licensed business: [¶] (a) To hire or separate employees. [¶] (b) To contract for the purchase of furniture, equipment or supplies other than the occasional replenishment of stock. [¶] (c) To disburse funds of the licensed business other than for the receipt of regularly replaced items of stock. [¶] (d) To make, or participate in making, policy decisions relative to operations of the licensed business." (Cal. Admin. Code, tit. 4, § 57.5.)

A new section, filed and effective after the events of this case, deals with the "Qualifications of Manager." (Cal. Admin. Code, tit. 4, § 57.6.)

the agents of the bank. A business man usually charges the price of goods to the party buying, and not to the agent of such party." (124 Cal. at pp. 227-228.) The same case demonstrates that liability cannot be placed upon the partners as owners because they were incidentally benefited by rent payments which were the fruits of retail sales of goods furnished the concessionaire by the creditors. (*Id.,* at p. 228.) Such cases as *Donnelly* v. *S.F. Bridge Co., supra,* 117 Cal. 417 and *Wahyou* v. *Kiernan, supra,* 145 Cal.App.2d 443, where there is an attempt to secretly terminate an existing agency, or facts sufficient to give rise to an actual agency, are not applicable to the situation here.

Nevertheless, the court also found that some creditors assumed as a matter of course that the business was being conducted by the people to whom the license had been issued. (See fn. 13 above, finding "7.") The trial court denigrated this assumption as unworthy on the ground that it was not based on any inquiry of the partners or any representation made by them. *(Id.)* As has been pointed out, the use and posting of the partners' license could constitute a representation that the concessionaire was the agent of the licensees. Therefore the facts must be examined to determine whether any creditors did in fact reasonably rely on that representation.

None of the creditors furnishing foodstuffs produced testimony that it ever investigated to determine if or to whom the on-sale liquor license was issued, or that it relied on the credit of the licensees in furnishing foodstuffs to "Padovan's on the Green." Since there was no liability to those creditors as a matter of law (part III above), the trial court properly denied the assignee recovery on those accounts.

With respect to the liquor wholesalers there was some general testimony that it was the practice "to sell to the license,"[15] that when a

---

[15] The law and regulations require each on-sale general licensee to keep the original bills and invoices in connection with the purchase of distilled spirits for a period of three years (§ 23334 and Cal.Admin. Code, tit. 4, § 7). At the time of the transaction in question section 17 of the applicable rules provided in pertinent part as follows: "(a) Every sale or delivery of alcoholic beverages, except beer, from one licensee to another licensee must be recorded on a sales invoice, whether or not consideration is involved . . . . [¶] Each sales invoice shall have printed thereon the name and address of the seller and shall show the following information: [¶] (a) Name and address of the purchaser . . . ." (Cal.Admin. Code, Register 56, No. 19 filed Oct. 2, 1956, effective December 1, 1956.)

On May 7, 1974, following the decision of the Court of Appeal in this case and grant of a hearing by this court, and effective June 10, 1974, the department amended the language of subparagraph (1) of paragraph (a) of section 17 to read as follows: "(1) Name and address of the purchaser. The name of the purchaser

new enterprise was opened it was the practice to ascertain directly from the licensing department or indirectly through "Business Extension Bureau," a service furnishing information concerning the issuance and transfer of liquor licenses, the location and name of the new licensee, and that the credit managers of the leading wholesalers would meet periodically and exchange information concerning their customers. It may be assumed that information received from the department or from the business service that the partners' license was being used for the bar and restaurant at the licensed premises would be a representation chargeable to the partners because they in fact authorized the use and posting of the license at the premises. Information emanating from various credit managers could not be charged to the licensees, and, in fact, the testimony of one of the credit managers indicates that the license and accounts in question were never discussed. In any event it is necessary to look to the testimony adduced on behalf of each wholesaler to determine to whom it sold and advanced credit.

In view of the fact the trial court failed to find that the permissive use of the partners' license by Padovan was an act or neglect by the partners which could give rise to ostensible agency, and because the testimony concerning the reliance of the liquor wholesalers on that factor varies, the matter must be remanded to the trial court for review of the evidence concerning those claims in the light of the principles enunciated above.

The judgment is reversed insofar as it denied recovery to plaintiff assignee on the claims of eight liquor wholesalers, and the case is remanded for further proceedings in accordance with the views set forth in this opinion. Let each party bear his own costs on appeal.

Wright, C. J., McComb, J., Mosk, J., Clark, J., Burke, J.,* and Taylor, J.,† concurred.

---

may be shown as the name of the licensee or the trade name under which the purchaser operates, or both the name of said licensee and the trade name under which he operates. When the trade name only of said licensee is used on the invoice, the vendor shall keep a record on his licensed premises showing the name of the licensee as set forth on the license certificate issued by the department. [¶] Any licensee who is authorized to sell and who does sell to another licensee shall keep a record showing the name or names of the person or persons to whom the license of the purchasing licensee is issued. These records shall be kept for a period of three years." (Cal.Admin. Code, Register 74, No. 19.)

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.